Tammy CRANSTON *v.* Timothy CARROLL

CA 06-209                                        242 S.W.3d 643

Court of Appeals of Arkansas
Opinion delivered November 15, 2006

*Wm. C. Plouffe, Jr.*, for appellant.

*Mary Thomason*, for appellee.

TERRY CRABTREE, Judge. Appellant Tammy Cranston appeals from an order granting appellee Timothy Carroll's petition for a change of custody. Tammy raises one issue on appeal in which she argues that the trial court applied the wrong burden of proof, and six others contesting the individual findings made by the trial court in reaching its decision. We affirm the trial court's decision.

On April 30, 1999, Tammy gave birth to a daughter, J.T. At the behest of the Child Support Enforcement Unit, it was subsequently established that Tim was the child's biological father. Tim was granted visitation with J.T. by an agreed order entered in March 2003. Tim filed a petition for a change of custody on November 9, 2004, alleging as changed circumstances that Tammy had physically abused the child, that Tammy was abusing drugs, that Tammy did not have stable employment, and that Tammy was not providing a stable home because she had lived in several places over a sixteen-month period. The trial court set a hearing on Tim's petition for November 29, 2004.

Although Tammy was served with notice of the hearing and had hired an attorney, neither she nor her attorney appeared at the scheduled hearing. On the day of the hearing, the trial court entered an order vesting temporary custody in Tim and awarding Tammy visitation every other weekend and a week at Christmas. On June 7, 2005, Tammy filed both an answer to Tim's petition for a change of custody and a motion to set aside the temporary order. In her motion, Tammy asserted that she had experienced problems with her attorney who had assured her that he would obtain a continuance of the November hearing and that, when she was finally able to retrieve her file from the attorney, it contained a motion for a continuance that had been prepared before the hearing, but had not been filed. The court scheduled a hearing for August 22, 2005, on Tim's petition for a change of custody and Tammy's motion to set aside the temporary order. The trial court found that Tammy was not at fault for failing to appear at the previous hearing and proceeded to decide anew Tim's motion for a change in custody.

On this issue, Tim testified that he was employed as a pipe fitter and lived in the Norphlet school district. Another child of his, a son, had been killed crossing the road in front of Tim's house. He said that he was prompted to file the petition for a change of custody after an incident that occurred during an exchange of visitation. Tim testified that he was supposed to return the child to Tammy at 6:00 on Sunday evenings, but that on this occasion Tammy appeared at his house at 5:30 to pick up the child. He said that the child did not want to go with Tammy and that he begged Tammy to let him talk to J.T. and bring her home later. He stated that Tammy would not listen, and instead put her arm around the child's neck and dragged her to the car. Tammy continued to hold the child around the neck in the car, at which time the child bit Tammy on the arm and ran back inside the house. Tim testified that Tammy pulled the child out from behind the couch by her leg and dragged the child, who was screaming and crying, back to the car.

Tim further testified that the child's coat had been left at his house in all the confusion and that he and his wife went to Tammy's home the next day to return the coat. He said that J.T. had a black eye. He testified that the child was not in school on Tuesday or Wednesday but that he visited her at school on Thursday. Tim said that the child's eye was still faintly bruised and that there was bruising on her hip and wrists.

Tim enrolled J.T. in kindergarten in Norphlet when he acquired temporary custody in November. He said that J.T. had missed a lot of school and was often tardy in kindergarten at Smackover where Tammy had her in school, and that she was behind in her skills. He said that she had only four excused absences due to illness in the 104 days that she was in school while in his custody. He said that at kindergarten graduation, J.T. received the "N" award for good citizenship.

Tim said that his wife did not work and that she and J.T. got along well. He denied using illegal drugs and offered to submit to a hair-follicle test to prove that point. Tim testified that for fun he and J.T. caught bugs, lizards, and frogs and that they went camping and fishing. He said that J.T. loves to swim and be outdoors and that they had floated the Caddo River in a canoe. Tim stated that he had never spanked J.T., and that he disciplines her by talking to her, having timeouts, or by taking away privileges. Tim produced a leather strap that was introduced into evidence. Tim said that he came into possession of the strap when Tammy moved out of his

house and that he had seen Tammy use the strap on J.T. He stated that he had obtained an order of protection when he and Tammy separated because Tammy had held a cocked gun to his head.

Tim testified that since he had gotten custody he had never had a baby sitter, saying that "if we can't do it as a family, we don't do it." He said that in his home there was a set routine and that his home was stable, unlike that of Tammy who had lived in different places over the past few years. He said that there were times when he could not find where Tammy lived, and he said that he had picked up J.T. for visitation at Tammy's parents' and sister's houses, as well as a house owned by a man named Tony, who lived across from the Smackover school.

Tim also testified about an incident that occurred at J.T.'s kindergarten graduation. He said that Tammy had insisted on taking the child's original papers even though he offered to make copies for her. He said that Tammy threw back her fist as if she were going to hit him and said that he was a "dead mother fucker."

Tim's wife, Vicki, testified that they had married in July 2004. She had three grown daughters and had been employed as a waitress. She said that she quit her job when J.T. came to live with them. She also recalled the visitation exchange where Tammy had dragged the child out of the house kicking and screaming. She said that she, too, saw the black eye on J.T. the next day.

Vicki had kept a journal regarding visitation since the temporary custody order. She said that Tammy was an hour and a half late picking J.T. up for Christmas visitation, and that they were supposed to get her back at 1:00 p.m. on the appointed day, but that Tammy was not at home. On Tammy's next visitation, J.T. was picked up by a woman named Becky and the following time J.T. was picked up by Tammy's parents. Tammy was not at home when they went to pick her up, and the child was waiting for them in their driveway when they got home. Tammy had not informed them that she had moved. On February 27 and March 13, Tim and Vicki picked J.T. up at the home of Thomas Logois, who lived across the street from the school in Smackover. On March 25, Tammy's sister picked the child up, and they retrieved her from the sister's house. Vicki testified that, when Tammy picked her up on April 9, Tammy got loud and began cursing while demanding clothes and information about the child's school. On May 20, Tammy honked her horn all the way down the street and again in the driveway. She said that there was a big bruise on

J.T.'s leg when she got home on June 5. She and Tammy exchanged heated words on July 1 when Vicki simply asked Tammy where they were supposed to pick the child up.

Vicki testified that at the child's kindergarten graduation Tammy pushed her out of the way as she (Vicki) was putting on the child's cap and gown. She said that Tim asked Tammy if she wanted copies of J.T.'s diploma and papers but that Tammy demanded the originals. She saw Tammy draw her fist back and heard her say to Tim, within earshot of J.T., "You're a dead mother fucker." Vicki said that afterward Tammy hit her in the stomach with a camera bag. Vicki said that the blow was painful.

Vicki further testified that they had established a routine for J.T. that consisted of a set time for meals, bathing, school, and going to bed. She said that Tim took her to the bus stop for school every morning. Vicki stated that, when they enrolled J.T. in school at Norphlet, they had to help her with her numbers and letters, but that by the time the school year was over she had caught up with the other children.

Steve Carroll, Tim's brother, testified that Tim was a loving and caring father. He said that Tim provided her with all that she needed and that she seemed to be well-adjusted. He recalled an occasion when Tammy had asked him to come over to her house to uncock a loaded gun that she claimed to have held to Tim's head. He said that the gun was a .357 Magnum revolver and that he removed the round in the chamber and took the bullets with him.

On her part, Tammy testified that she had been living with her parents in Pigeon Hill for six months and that she had just started teaching in El Dorado. She said that she was certified to teach special education and art. She had resigned in December 2002 from teaching in El Dorado after seven years. After that, she worked for the Elaine school district from November 2003 until June 2004. She said that she had lived at 209 East Sixth Street in Smackover beginning in August of 2004 prior to moving in with her parents. Before that, she had lived in West Helena for two months. She said that she had not lived with a man named Thomas Logois in Smackover. She maintained that she had lived in an apartment in the back of his house, and that she cleaned his house and did chores for him. She said that she had no relationship with him other than his being her landlord.

With regard to the November visitation incident, Tammy testified that J.T. had wanted to stay to see Vicki's grandchild and that she jumped behind the couch and started crying and throwing

a fit. She said that she carried, but did not drag, J.T. to the car and that J.T. bit her arm. She said that she did not have a "choke hold" on the child and that J.T. had not run back into the house after biting her. She also said that J.T. felt badly and had apologized for biting her. She said that J.T. did not have a black eye that Monday and that she had not held J.T. out of school. She said that the child was in school on Monday and that everyone there could see that she did not have a black eye. She said that the child had missed school that Tuesday and Wednesday because she had dental appointments concerning her wisdom teeth and that she was in pain and staying with her parents those two days.

Tammy said that J.T. was not behind in kindergarten, saying that it was hard to be behind because it was just the start of schooling. She said J.T.'s teacher in Smackover was a little bit negative, but that the teacher told her that she was improving and was a smart kid. She said that Tim had not informed her of parent/teacher conferences in Norphlet. Concerning J.T.'s gradu-ation, Tammy said that she had merely asked Tim not to remove the tassel so that she could take a picture. She denied hitting Vicki or threatening Tim at the ceremony.

Tammy testified that she had depended on friends and family to survive when she was out of work and that she had cleaned houses and done yard work. She denied that Mr. Logois had supported her. She said that J.T. had her own bedroom at her parents' house and that she was looking at apartments and a couple of houses in which to live. She said that she had not held a gun to Tim's head, but that he was the one who had a gun. Tammy testified that she had previously been married for seven years and that she had been diagnosed with infertility and had several surgeries, and that her infertility had led to the divorce. She said that she had a brief relationship with Tim over one summer, that she and Tim had stopped seeing each other when she found out that she was pregnant, and that Tim had nothing to do with J.T. after her birth. She denied spanking J.T. with a belt and said that she disciplined the child by talking to her.

Susie Ayres, Tammy's cousin and an admitted felon, testified that Tammy was a wonderful mother. She said that Tammy spent time with J.T., that she loves J.T., and that she would hold her for hours. She said that Tammy watched cartoons and colored with J.T.,and that she made sure that she was cared for , properly dressed and well fed. She had never seen J.T. with a black eye and said that Tammy had never laid a hand on the child. Ms. Ayres testified that

she had last seen Tim and Vicki in August of 2004 at the home of Leshia and Blake Hicks. She said that the four were smoking marijuana while J.T. was in the room. She did not believe Tim to be a fit father. She said that he had always been a "drug head and a drunk," and that he had denied the child for years.

Tammy's father, Charles Taylor, testified that Tammy had lived with them since November 2004. He had never seen Tammy strike J.T., and he had not seen the child with a black eye or bruises. He had never seen Tammy use a belt to spank J.T. Mr. Taylor testified that Tammy only stayed with Mr. Logois a few days. He remembered that Tammy's wisdom teeth had cost $550.

Janet Hanson, Tammy's sister, testified that Tammy was a good mother and that she had not seen her whip J.T. She said that Tammy listens to J.T. and that she is patient with her. She had never seen a leather strap. Ms. Hanson testified that she attended J.T.'s graduation and that she did not hear anyone cuss or see anyone being hit. She said that if anyone had called someone a "MF" she would have heard it. She remembered that Tammy had gone to the dentist several times about her wisdom teeth.

Penny Hicks testified that she had known the parties for many years. She described the relationship between Tammy and J.T. as a loving one. She said that Tammy had been depressed since Tim had been granted temporary custody and that Tammy enjoys her visitation with J.T. and hates for it to end. She said that Tammy had wanted a child for years and spent a great deal of money trying to have a child. She had never seen Tammy spank J.T., nor had she seen any bruises on her.

At the conclusion of the hearing, the trial court held the record open for the submission of Tammy's dental records and evidence clarifying the child's attendance records at school. The court also ordered the parties to take a hair-follicle drug test.

The trial court issued a letter opinion outlining its decision to change custody on October 6, 2005. The trial court found that Tammy had lived in multiple residences, including the home of Thomas Logois. The court said that Tammy's explanation about staying in Logois's home made no sense and was not credible, and that it was an example of her placing her personal interests and needs over that of the child. The trial court was of the opinion that it was in the child's best interest to receive a quality education. The court found that Tammy had not made a commitment to that end. The court found that the records showed that the child had missed

the first day of kindergarten, and that between September 20, 2004, and November 12, 2004, the child had been absent from school seven days and that only two of those absences were excused. The child had also been tardy three times during that period. The court further noted that Tammy had missed a parent-teacher conference. The court said that, had Tammy attended the conference, she might have discovered that the child was not performing up to her capabilities. The court found that Tim's commitment to the educational development of the child was far superior than Tammy's. The court noted that, while the child had been having difficulties in school when Tim gained custody, she had since improved and had caught up with the class in reading and in math, that she now completes her school tasks on time and independently, and that she had earned the math award for her kindergarten class. The court observed that the child had four excused absences from school out of 103 days when living with Tim, and that Tim and Vicki had attended parent-teacher conferences. The trial court found that J.T. had enjoyed school since residing with Tim and that there was a greater sense of routine and stability in the child's life than that which had existed when she lived with Tammy.

The trial court also found that Tammy lacked credibility. The court found that Tammy's dental records did not support her testimony about her wisdom teeth. The court found that Tammy was also untruthful in her testimony concerning Mr. Logois. The trial court also expressed concern about Tammy's judgment. The court found that Tammy had forced the child from Tim's home that Sunday in November, and that she had rejected Tim's offer to bring her home later, to the detriment of the child. The trial court also found that Tammy had insisted on receiving the child's original diploma, and that she had directed profanity at Tim and had struck Vicki with a camera bag. The trial court specifically found that it did not believe Tammy's version of events concerning the graduation ceremony.

Finally, the trial court noted that Tammy's drug test had been negative, but that Tim had tested positive for cocaine. The court found, however, that there was no evidence presented showing when Tim had used cocaine, nor was there any evidence as to where the child was when he used cocaine. The court noted the trial testimony of Tim's marijuana usage, but concluded that, thus far, Tim's drug use had not had an adverse impact on the child.

Arkansas Code Annotated section 9-10-113(b) (Supp. 2005) provides that a biological father may petition for custody if he has established paternity in a court of competent jurisdiction. Custody may be awarded to a biological father upon a showing that he is a fit parent to raise the child; he has assumed his responsibilities toward the child by providing care, supervision, protection, and financial support for the child; and it is in the best interest of the child to award custody to the biological father. Ark. Code Ann. § 9-10-113(c). In addition, the father of an illegitimate child must also show a material change in circumstances. *Norwood v. Robinson*, 315 Ark. 255, 866 S.W.2d 398 (1993). If this threshold requirement is met, the trial court must then determine who should have custody with the sole consideration being the best interest of the child. *Bernal v. Shirley*, 96 Ark. App. 148, 239 S.W.3d 11 (2006).

In child-custody cases, we review the evidence de novo, but we do not reverse the findings of the trial court unless it is shown that they are clearly erroneous. *Deluca v. Stapleton*, 79 Ark. App. 138, 84 S.W.3d 892 (2002). Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. *Alphin v. Alphin*, 90 Ark. App. 71, 204 S.W.3d 103 (2005), *aff'd*, *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005). There are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving minor children. *Id.*

Tammy's first argument is that the trial court applied the wrong burden of proof in making its decision. Tammy refers to language in our case law stating that a "more rigid standard" is required for custody modifications than for initial custody determinations, *see Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002), and she argues that Tim had the burden to prove a material change in circumstances by clear and convincing evidence. However, in *Cozzens v. Cozzens*, 93 Ark. App. 415, 220 S.W.3d 257 (2005), we confirmed that the burden of proof in change-of-custody cases was by a preponderance of the evidence. In so holding, we observed that the more rigid standard spoken of in the case law referred to the requirement of showing a change in circumstances, and not a heightened burden of proof. Thus, there is no merit in Tammy's argument.

Tammy also contends that the trial court erroneously found that she was living with another man. She contends that there was no evidence that she was actually living with Mr. Logois. We disagree. Tammy admitted that she was living in this man's home, and her father testified that she had been living there as well. Visitation exchanges occurred at the Lagois residence. The trial court did not believe Tammy's testimony that she was living in a back room and doing housekeeping and yard work for him. Given the deference we have for the trial court's superior ability to assess the credibility of the witnesses, we cannot say that its finding is clearly erroneous.

Tammy also argues that the trial court erred by not accepting her testimony that her wisdom-tooth problems were the cause of the child's missing school the week after the visitation-exchange incident. She contends that there is no proof contradicting her testimony because her dental records are not in the record. There is also no merit in this argument. The trial judge held the record open for the submission of the dental records, and it is clear from the letter opinion that he considered those records in making his findings. That those records were not placed in the record does not inure to Tammy's benefit because it was her burden, as the appellant, to bring up a record sufficient to demonstrate error. *See Dodge v. Lee*, 352 Ark. 235, 100 S.W.3d 707 (2003).

Tammy next argues that the trial court erred in finding that she was not committed to providing the child with a quality education. The record in this case shows that while in Tammy's care the child did not begin school on time and that she had multiple unexcused absences in a short period of time. The child was also tardy on several occasions, and Tammy missed a parent-teacher conference. There was also testimony from Tim and Vicki that the child was behind and having difficulties in school. The trial court's finding is not clearly erroneous.

Tammy further argues that the trial court erred in relying on her changes in residences and employment as a basis for its decision because it was not shown that they had an adverse effect on the child. The evidence showed that appellant had lived in El Dorado, West Helena, one address in Smackover, and then another place in Smackover with Mr. Logois, and then with her parents. She had changed jobs three times since 2002 and was at times unemployed, when she did odd jobs and lived off the largess

of others. Contrary to Tammy's assertions, her moves and changes in employment do portend that she was not providing a stable home for the child. The trial court's findings in this regard are not clearly erroneous.

■ Tammy further argues that the trial court erroneously found that she had struck Vicki with a camera bag. This finding was based on an assessment of the witnesses's credibility. The trial court believed Vicki's testimony about the incident, and found that Tammy and her sister's testimony was not credible. Again, giving due deference to the trial court, we cannot say that the trial court's finding is clearly against the preponderance of the evidence.

Tammy also takes issue with the trial court's findings with respect to Tim's drug usage. She points out that Tim had accused her of using drugs, that he lied in his testimony when he denied using drugs, and that he was the one who insisted on drug testing. We, too, are troubled by Tim's apparent drug usage, but when all of the evidence is considered, we are not convinced that the trial court's findings are clearly erroneous.

The evidence in this case showed that Tammy often changed residences and employment; that there were periods when she was not employed even though she was well-educated and capable of working; that she was late getting the child into school; that the child was frequently absent from school and tardy while in her care; that the child did poorly in school while in her custody; that she struck Vicki without provocation and threatened Tim at the graduation ceremony in the presence of the child; and that she physically and forcibly dragged the child out of Tim's home during a visitation exchange when she was not even supposed to pick up the child. In light of this evidence, it can hardly be said that there was no material change in circumstances. Consequently, it was for the trial court to then determine which custody placement would be in the child's best interest. The testimony deemed credible by the trial court demonstrates a lack of stability, maturity, and judgment on Tammy's part. Her behavior was shown to be volatile and abusive, and she displayed an attitude of disinterest towards the child's education, all of which were found by the trial court to be detrimental to the child. In contrast, the child had thrived while in Tim's care, and there is no hint in the record that she had suffered any ill effects from being in his custody.

■ In *Respalie v. Respalie*, 25 Ark. App. 254, 756 S.W.2d 928 (1988), we recognized that a trial court's best-interest determination may not always provide a flawless solution where placement with either parent may not be ideal. In this case, although Tim did test positive for cocaine usage, considering the negatives associated with continuing permanent custody with Tammy, we believe that the trial court in weighing the evidence could find that changing custody was in the child's best interest. We are thus unable to conclude that the trial court's decision is clearly erroneous.

Affirmed.

PITTMAN, C.J., BIRD and NEAL, JJ., agree.

HART and GLOVER, JJ., dissent.

DAVID M. GLOVER, Judge, dissenting. I decline to agree that it was in J.T.'s best interest to place her with her father. In the drug tests, conducted post-trial by court order, Tim tested positive for cocaine, and Tammy tested negative for any drug. The trial court appears to gloss over this fact, stating that thus far, Tim's "drug use has not had an adverse impact on [J.T.]." While our court defers to the trial judge on issues of credibility, in my opinion, the trial court's findings against Tammy in granting Tim's petition for change of custody pale in comparison to Tim's positive drug test. I do not think that it is prudent to take a "wait and see" approach until such drug use does adversely impact J.T. The majority is merely "troubled" by Tim's "apparent" drug use.

At the hearing, Tim twice testified that he did not use drugs, but he then presented a hair sample for drug testing, and the sample tested positive for cocaine. The trial court found that "no evidence has been presented that indicated when [Tim] used cocaine or that would indicate where [J.T.] was at the time that he was under the influence of cocaine." That is a distinction without a difference in my opinion — the drug test positively proved that Tim had lied to the trial court about his drug use, and that he had clearly used cocaine since the time J.T. was placed in his custody by default ten months prior to the final hearing. At the very least, Tim failed to provide the trial court a reasonable explanation for this test result, and I believe that the trial court was remiss in failing to reopen the case and question Tim further, in view of his testimony of abstinence from drugs, before entrusting him with his young

daughter's welfare. At the hearing, Tim denied that he was present at Blake Hicks's house in August 2004 smoking marijuana as recounted by witness Susie Ayres — accordingly, Tim's positive test for cocaine also brings his opposition to Ms. Ayres's testimony into question as well. The trial court recounted in its order that Tim had testified that he had not smoked marijuana since November of 2004, which was the month he obtained temporary custody by default. I find it implausible that Tim did not ingest cocaine during the time the trial court had entrusted him with the temporary custody of his minor daughter pending the final hearing.

In *Ford v. Ford*, 347 Ark. 485, 65 S.W.3d 432 (2002), our supreme court affirmed an award of custody of the minor children to the father. In that case, one of the factors the trial court used in determining the issue of custody was that the mother had tested positive for amphetamines and methamphetamine, while the father's test results were negative.

Overlying my earlier concerns that Tim's post-hearing, positive cocaine test failed to trigger additional inquiries by the trial court, the record also reflects that Tim has not taken an interest in any of his three children until he became intent upon wresting custody of this, his third child, away from her mother. Tim testified that a son, who is now deceased, was living with Tim's parents at the time of that child's accidental death. Tim also testified that he was the biological father of another daughter, whose parentage was speculative because he had never brought a paternity action. Finally, regarding J.T., Tim testified that he did not bother to submit to a paternity test until she was three years old. From his own lips, his suddenly becoming a "responsible custodial parent" is questionable.

This dissenter will not condone giving custody of this child to her father, who not only possessed a poor parental history but also tested positive for the illegal drug cocaine after he testified that he did not use drugs, in opposition to her mother, the child's custodian for all of the child's life, who tested negative for any illegal drug use. I am authorized to state that Judge Hart joins me in this dissent.