ROBERT J. GLADWIN, JUDGE
Ashley Cordell appeals the Baxter County Circuit Court's order changing custody of the parties' children to appellee Joshua Cordell. The circuit court also found Joshua in contempt for failing to pay Ashley $12,500 in retirement proceeds pursuant to the parties' property-settlement agreement (PSA) and ordered that Joshua's child-support arrearage and the retirement proceeds he owed be partially offset from Ashley's new child-support obligation. On appeal, Ashley contends that the circuit court erred by changing custody and by failing to require Joshua to pay the amounts he owed. We affirm.
I. Facts
Ashley and Joshua were divorced on June 18, 2015, and Ashley was awarded custody of their three children, HC1 (born July 7, 2003), AC (born September 16, 2004), and HC2 (born July 25, 2007). Incorporated into the decree was the parties' PSA providing that Joshua would pay $947 per month in child support, and visitation would be agreed on by the parties. Also, among other obligations, the PSA stated that Joshua had cashed his Eaton retirement account in the amount of $25,000 and that he would pay Ashley one-half in the amount of $12,500 no later than 90 days from the date of filing, June 18, 2015.
On October 4, 2016, Joshua filed a petition to modify custody based on a change in circumstances. Joshua alleged that Ashley and the children were moving to Bryant, Arkansas, with Donnie Ramsey, Ashley's boyfriend. Ashley pled unclean hands and laches and sought dismissal of Joshua's petition.
A temporary order filed March 2, 2017, reflects that a change in circumstances had been demonstrated that temporarily modified the visitation. The circuit court provided specific instructions regarding visitation exchanges for the parties' children through March 2017 and ordered a paternity test be performed on HC3, a child born after the parties' divorce decree was filed.[1]
A week after entry of the temporary order, Ashley filed a motion for contempt against Joshua alleging that he was $9042 in arrears on child support, and she asked that Joshua be ordered to pay the arrearage and remain current. She also alleged that Joshua had not paid the $12,500 owed to her for half of his retirement account under the PSA. She asked that Joshua be ordered to pay her the $12,500 "immediately."
At a hearing held June 29, 2017, the parties' three children testified, giving positive statements about both parents. Each child described living in Bryant with their mom and Donnie. HC2, age 9, said that he wanted to live with his dad. He said that when he had been with his dad, he had a wreck on the four-wheeler and had to have surgery on his arm because his elbow had been shattered. He said that it was after *502 midnight when he had wrecked and that he had not been wearing a helmet.
AC, age 12, testified she did not like Bryant Middle School because she was being bullied. She said her grades were good in both Bryant and Mountain Home. She said she helped HC2 with his homework, and when they were with their dad, he would help with homework. She said that if she lived in a perfect world, she would live in Mountain Home. She said that her mother and Donnie sometimes argued, but not much. She said that she had to skip school to babysit her baby sister, HC3, while living in Bryant. AC said that she was involved in competitive cheerleading and that her dad tried to go to all of her performances. She said that she would rather live with her dad, but she did not want to leave her mom. She said that she had come home from her dad's house with lice on two occasions. She said that she had been in competitive cheerleading in Mountain Home too.
HC1, age 14, testified that she liked Bryant Middle School and that she had not been bullied. She said that her sister helps HC2 with his homework and that her mother and Donnie did not argue much. She also said that she had to skip school to babysit her baby sister, HC3. She said that she had to blow into her maternal grandmother's, Pam O'Dea's, Breathalyzer when she rode with her. She said that she cheered in competitions and had been doing so for six years. She said that she got lice two times while at her dad's home and that she would choose to live with her mother.
Ashley testified that she works in human resources for SA Pharmaceuticals and began working there October 3, 2016. She said that she had moved to Bryant the last week of September 2016 and that she had decided to move because she got a better job offer. She was dating Donnie at the time, and he lived in Bryant. She said she was currently married to Donnie, whom she met at a bar in Mountain Home, and that she did not plan to have children with him.
Ashley said that Joshua had a hard time during the divorce, and that caused him to get a DWI in January 2015 when he had overdosed on prescription medication and tried to leave their house in his truck. She said that Joshua had hit a tree, neighbors called police, and Joshua had been arrested. She said that he spent three days in ICU and was discharged to a psychiatric hospital for a week rather than going to jail.
Ashley said that she had received the paternity test on HC3 and that Joshua is not the child's father. She said that even though the temporary order required that she have the paternity test done as soon as possible, it had been hard for her to make the time to do it because she worked full time. She said HC3's father is Dan Owens and that she had a relationship with him while she had been separated from Joshua. She said that Joshua had always had known that he was not HC3's father and that after their divorce in June 2015, she and Joshua tried to work things out, so he moved back in October. She said Joshua had known she was pregnant and that the child was not his. After she gave birth in December, Joshua wanted HC3 to be "no different than the other kids." She said that they finally split up in March 2016.
Ashley said that she and Donnie never argued and that they only had slight disagreements. She said that the children had a good relationship with Donnie and that they felt comfortable with him. She said that she would "absolutely describe him as being active in their lives." She said that she had moved to Bryant for a better-paying job and to provide a better life for her children. She said that their grades *503 had significantly improved, especially HC2's, who is an A and B student now. She said that the girls are in "cheer" for which she pays $255 per month. She said that each season costs $1000 per child for uniforms, shoes, and accessories and that Joshua does not pay for that. She said that the children are currently on ARKids insurance but that her recent pay raise would disqualify them for that program, and she would be putting them on her work insurance.
Ashley said that she was against the children riding four-wheelers and dirt bikes without adult supervision and without helmets. She described HC2's four-wheeler accident as happening at 2:30 a.m. and said that she was notified when they arrived at the emergency room "roughly at 2:30 in the morning." She said that she was not told about the dirt-bike wreck that happened during spring break until she picked up the children on Friday and saw scrapes all over HC2. She said that he had not been wearing a helmet. She said that she cannot communicate with Joshua about the four-wheeler and dirt bike because he is argumentative.
Ashley said that cleanliness was an issue at Joshua's house because the children had come home with lice "several times." She said that they knew it is coming from Joshua's house because they did not have it when they went, and they had it when they returned. She said that she wanted the children to continue to reside with her because she took good care of them, she had a very good job, and the children were used to living with her.
She said that Joshua had been ordered to pay child support and that he was behind $9,877.99. He was supposed to pay $948 per month, and his garnishment began in September 2016. She asked that he be ordered to pay her the $12,500 pursuant to the PSA and be held in contempt for nonpayment.
Joshua testified that he lived in a five-bedroom, three-bath home in Mountain Home. He said that the home sits on ten acres and that he had room for his children; each child had a bed and a dresser, and the bathrooms were segregated for boys and girls. He introduced photographs of a stocked freezer, pantry, and refrigerator, and other pictures of the house, both indoor and out.
Joshua said that he was married to Tina. He said that after the divorce he had seen his children quite a bit, especially before and during the move Ashley had made to Bryant because he had kept the children with him. He said that after they moved to Bryant, there was a big change. Now he only sees them according to the court order and at Ashley's whim. He said that when they had lived in Mountain Home, he was included in the school and extracurricular activities. Now he does not know about the school year except for when the children call. He said he had learned the day before the hearing that he was not HC3's father. He said that he and Ashley had been married to each other when HC3 was conceived and that he and Ashley remained together after the divorce. He said he had thought there was a good possibility that the child was his and that they had discussed it. He said that the paternity test was "retaliation" for wanting to spend time with his children. He said that HC3 called Donnie "Dad" and that he quit picking her up for visitation because he did not want to confuse her.
Joshua said that he worked at Meeks Lumber making ten dollars per hour. His gross income for 2016 was $14,989. He pays his child support through wage withholding, and he did not know if he paid the full amount. At the end of each pay period, he is left with between eighty and ninety *504 dollars. He said that his wife also helped him with the children. He said that he had been working at Eaton when child support was first established, and he had not been able to get another job that paid as well. He said that when he left Eaton he cashed out his retirement. He said that he and Ashley spent the retirement money during the time they had been together, during and after the divorce, and that they had spent the money on household bills and vehicle repairs.
Joshua admitted that HC2 had a four-wheeler accident but said that it seemed worse than it really was. He said that he immediately took HC2 for medical attention. He said that if the judge were to tell him to get helmets for the kids, he would do it. He also said that if he were to get custody, he would not ask for child support and that he would never keep the children from their mother. He denied that he had ever had lice and said that his house remained clean.
On cross-examination, Joshua said that he married Tina on February 19, 2017, and that they lived in her house. He said that he had moved in while her husband still lived there. "He left and I continued to live there. We did not have a relationship until after." He said he did not know how long he had lived with Tina before she divorced her husband.
After the hearing but before an order was filed, Joshua filed a verified emergency petition for change of custody with attached affidavits from HC1 and AC. In the affidavits, the girls stated that their mother was dating a married man named Kelly Webb and had been since before the last court hearing. They stated that their mother had told them not to say anything about Kelly to the court at the prior hearing, and they alleged that their mother was moving them to an apartment in Cabot to be closer to Kelly Webb. The children stated that they would be forced to go to Bryant schools for three weeks then be moved to Cabot schools. They claimed that they had been keeping HC3 while their mother went out with Kelly and that they sometimes went to hotel rooms with their mother and Kelly.
At the hearing on the emergency motion, the children testified. HC1 said that Kelly had been her mother's boyfriend even during the last court hearing and that she had been married to Donnie then. She said that her mother had called her a "whore," but she thought it had been out of anger because they had been fighting. She stated that her mother and Kelly did not leave them alone at home but took them when they stayed at hotels; or they stayed at their home in Bryant, and Kelly stayed there too. She said they had moved to Cabot because they did not like Bryant. She said that she liked Cabot schools and that they lived closer to Kelly. She said that she thought Kelly was married and that she had driven by his house but had not gone inside. She said that her mother took them to spend the night with her and her boyfriend. "Sometimes it was together in the same room, and sometimes it was separate. Yes, I've slept in the same room as both of them before." She said that she did "cheer" in Cabot and that she was afraid if she went to her father's she would not get to do it. She said that she wanted to live with her mother and that she had written the affidavit because she had been upset with her mother. She said that her father had told them he was taking them shopping for school but instead took them to his lawyer's office and that he had told them what to write.
AC testified that she did not know if her mother was married "right now" and that her mother was dating Kelly. She said her mom had been having a relationship with him the last time they were in court. She *505 said her mother used to leave them home alone and go with Kelly, but she did not do that anymore. She said that her mother sometimes stayed out overnight while the kids stayed at the apartment. She said that she never went to a hotel with them overnight but that they did go there to talk to Kelly. She said that her sister skips school to watch HC3 sometimes. She said that she liked Cabot better than Bryant but that she still wanted to go to Mountain Home schools.
AC said that her mother had told her not to say anything about her relationship with Kelly at the last hearing and that her mother told her sister the same thing. She said that she felt guilty for lying and realized that it was wrong. She said that they had moved to Cabot to be closer to Kelly and also because they did not want to be in Bryant schools. She said that her mother and Kelly worked together. She said that their apartment had three bedrooms and that they each had a room except HC2, who shared with his mom "whenever Kelly is not there." She said that Kelly did not live with them and that he is married. She said that it upset her that her mother was dating a married man "because I don't know what he's going to do to my mom and cheat on her or something. Yes, that worries me quite a bit."
AC said that she wanted to live with her dad in Mountain Home. She said she had not been able to speak to her father because her mother had taken her phone and blocked her dad's number. She said she was to use her mother's phone to call her dad. "It doesn't matter to me if my mom marries Kelly, just I wish he wasn't married and dating my mom at the same time." She stated, "Yes, last time I was in court I said I felt like [HC3's] mom. I don't feel that way as much as I used to. But it's gotten better. Yes, that's because I don't have to stay home anymore and watch her. Yes, that's [HC1's] job now." She said that HC2 had been wearing a helmet since the last court date.
HC2 said that they had been in Cabot about a month, that he did not like the new school, that he liked Bryant better, and that he liked Mountain Home more. He would like to live with his dad. He said that he wears a helmet when riding the four-wheeler. He said that he had known Kelly during the last court hearing, but his mother had wanted to keep that a secret. He said that he did not talk to Kelly much but that Kelly seemed like a nice guy. He said that his mom and Kelly had left him home alone to go out. He said he had stayed the night with them at a hotel. He said that he had not seen Donnie since Donnie helped them move into the apartment at Cabot. He said that he slept on the couch. He said that he knows a lady named Rachel, his mother's friend, and that she had stayed with them in Cabot. He said that Rachel and his mother went out for fun and that Rachel slept in the bed with his mother and Kelly. He said that they kept the bedroom door locked. He said that his mother had blocked his dad's number from his sisters' phones, so he could not talk to his dad as often as he would like.
Ashley testified that she was still married to Donnie but that they were separated. She said that she knew Kelly from work, and their relationship developed after she separated from Donnie. She said that "a divorce has been filed this week." She said that Joshua had an affair while she had been married to him and that he had an affair with his current wife while she had been married. She said that her kids may not have known what was going on with their dad and Tina. She said that the children had stayed the night with their dad and Tina before they were married. She said that she did not know what *506 the difference would be with "what I'm doing with Kelly than what he did with Tina." She said that she believed it was okay to leave her children with her mother and asked, "Why does it matter how many DWIs she has? She has one. I have no idea if she is working on her second one right now, and I don't know what this pertains to my case and my children."
The circuit court ruled from the bench stating,
The parties were divorced by a decree of this court on June 18th of '15. And Ashley was awarded custody. Since that time, there has been a change of circumstances in that the parties have new families and new homes. And the children are older and not doing so well in school, some of them, at any rate. Both parties have engaged in improper conduct in front of the children that no person, parent or anyone else, should be involved in. But Ms. Ramsey has recently, in fact, been engaging in immoral conduct openly in front of the children. If there's any hope that the children are raised with any morals it will have to be with Josh. And I hope that can happen. I guess we'll see. So, I'll find that there's a change of circumstances, including this openly immoral conduct, and change custody to Josh.
If the kids are going to ride a four-wheeler or a motorcycle, they'll do it with a helmet. They'll not be riding after dark or without supervision. The children will not be allowed to ride in a vehicle driven by Ms. O'Dea.
....
Mr. Cordell is in arrears of child support. The last figure I had was $9,042. He also owes Ashley $12,500 as was part of the divorce settlement, which he hasn't paid. Again, he is in contempt. Ms. Ramsey will submit an affidavit of financial means within 10 days. The attorneys will look over it and calculate the amount of child support she owes. I'm going to deviate from the chart and require her to only pay one-half of the chart amount. The one-half Josh doesn't receive will be credited against the sum he owes Ashley until that sum is paid in full. Josh can claim the children for child support purposes.
A formal order encompassing the circuit court's bench ruling was filed on December 11, 2017. Ashley filed a timely notice of appeal, and this appeal follows.
II. Standard of Review and Applicable Law
This court recently reviewed a change-of-custody decision and set forth our standard of review and the applicable law as follows:
On appeal in custody matters, this court considers the evidence de novo and does not reverse unless the circuit court's findings of fact are clearly erroneous. Hodge v. Hodge , 97 Ark. App. 217, 219, 245 S.W.3d 695, 697 (2006). A finding is clearly erroneous when, although there is evidence to support it, the court is left with a definite and firm conviction that the circuit court made a mistake. Id. Due deference is given to the circuit court's superior position to judge the credibility of the witnesses. Id. The Arkansas Supreme Court has held that there is no other case in which the superior position, ability, and opportunity of the circuit court to observe the parties carry a greater weight than one involving the custody of minor children. Taylor v. Taylor , 345 Ark. 300, 304, 47 S.W.3d 222, 224 (2001).
The best interest of the children is the polestar in every child-custody case; all other considerations are secondary. Id. Factors a court may consider in determining what is in the best interest of the *507 child include the psychological relationship between the parents and the child, the need for stability and continuity in the child's relationship with the parents and siblings, the past conduct of the parents toward the child, and the reasonable preference of a child. Rector v. Rector , 58 Ark. App. 132, 947 S.W.2d 389 (1997).
For custody-modification cases, courts impose more stringent standards than they do for initial determinations of custody in order to promote stability and continuity in the life of the child and to discourage the repeated litigation of the same issues. Geren Williams v. Geren , 2015 Ark. App. 197, at 10, 458 S.W.3d 759, 766. The party seeking to modify the custody order has the burden of showing a material change in circumstances. Id. In order to change custody, the circuit court must first determine that a material change in circumstances has occurred since the last custody order; if that threshold requirement is met, it must then determine who should have custody, with the sole consideration being the best interest of the children. Id. Determining whether there has been a change of circumstances requires a full consideration of the circumstances that existed when the last custody order was entered in comparison to the circumstances at the time the change of custody is considered. Id. at 10-11, 458 S.W.3d at 766.
Buskirk v. Buskirk , 2018 Ark. App. 417, at 3-4, 559 S.W.3d 285, 287-88.
It is well settled that this court gives "due deference to the superior position of the trial court to view and judge the credibility of the witnesses. This deference is even greater in cases involving child custody, as a heavier burden is placed on the trial court to use the fullest extent of its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children." Lowder v. Gregory , 2014 Ark. App. 704, at 14-15, 451 S.W.3d 220, 229.
On appeal of child-custody cases, this court will consider the evidence de novo, but it will not reverse a circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. Hewett v. Hewett , 2018 Ark. App. 235, at 4, 547 S.W.3d 138, 140. The Arkansas Supreme Court has held that "[a] judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child, or when there is a showing of facts affecting the best interest of the child that were either not presented to the chancellor or were not known by the chancellor at the time the original custody order was entered." Id. at 3, 547 S.W.3d at 140 (quoting Jones v. Jones , 326 Ark. 481, 491, 931 S.W.2d 767, 772 (1996) ). Moreover, in determining that the circumstances have changed, a court is required to fully consider the circumstances that existed when the last custody order was entered and should compare it to the circumstances existing at the time the subsequent change-of-custody request is considered. Geren Williams , 2015 Ark. App. 197, at 10-11, 458 S.W.3d at 766.
Buskirk , 2018 Ark. App. 417, at 8, 559 S.W.3d at 290.
III. Change of Custody
Ashley alleges that the change of circumstances relied on by the circuit court were the parties' new homes and families, the change in academics of the children, and her recent alleged immoral conduct. She contends that both parties had remarried since the original custody *508 order. She had married Donnie and moved from Mountain Home to Bryant at the time of the first hearing, and at the second hearing, she had separated from Donnie and moved to Cabot.
She also contends that HC2 testified that he was doing well in school except for spelling, and AC testified that her grades were the same in Bryant as in Mountain Home. HC1 testified that her grades were better in Bryant than Mountain Home. At the second hearing, neither daughter testified that their grades had suffered in Cabot. Thus, Ashley contends that there was no material change in circumstances regarding academics.
Ashley argues that "the only issue" regarding immoral conduct was that she is dating a married man. She states that while it "may not be" proper for the children to be exposed to such behavior, it was not the first time they had been subjected to such behavior by a parent. She argues that after their divorce, Joshua moved in with his best friend's wife while the wife was still married. She claims that Joshua admits he did the very same thing, which he claims is the reason Ashley should not have custody. Thus, she argues that the alleged immoral conduct around the children is not a change of circumstances but is a double standard.
She claims that even if there were a change in circumstances, it is not in the children's best interest to change custody. She argues that the circuit court did not consider that she is the primary caretaker. See Wise v. Wise , 2010 Ark. App. 184, 374 S.W.3d 704. She contends that the children did not complain that she was not providing for their needs. She maintains she was doing so despite Joshua's nonpayment of child support.
She argues that the circuit court should also have considered the preference of the child. Ark. Code Ann. § 9-13-101(a)(1)(A)(ii) (Repl. 2015) (In determining the best interest of the child, the court may consider the preferences of the child if the child is of a sufficient age and mental capacity to reason, regardless of chronological age.). She contends that HC2 said that he wanted to live with his dad because he gets to ride four-wheelers and dirt bikes, which led to his injury because he was not supervised. AC said that she wanted to live with her dad. However, HC1 said that she wanted to live with her mom. Ashley cites Atkinson v. Atkinson , 72 Ark. App. 15, 32 S.W.3d 41 (2000), for the proposition that separation of siblings is not in the best interest of children. She contends that their separation from HC3 should also prevent a change of custody.
Ashley argues that Joshua's house is not best for the children because there are eight children there and he has insufficient funds. She argues there is no set bedtime and that HC2 said it was normal for him to be outside at 2:00 a.m. Thus, she argues that it was not in the children's best interest to change custody. She contends that, at most, the court should have prohibited immoral conduct in the children's presence.
Joshua argues that the circuit court appropriately found a material change in circumstances and that it was in the children's best interest to be placed with him. A de novo review reveals that the facts developed from both hearings showed that Ashley was dating a married man, Kelly, while still living with her new husband, Donnie, and the children knew it. She was allowing Kelly to stay overnight in the house with the children present. Sometimes her friend Rachel would also stay overnight in the bedroom with Ashley and Kelly. At least some of the children stayed overnight in a single hotel room with Ashley and Kelly. Further, the children were uprooted and moved the second *509 time in two years to follow their mother and her boyfriend. Also, Ashley was not honest with the circuit court at the first hearing regarding the status of her relationship with her husband Donnie because, as the children stated at the second hearing, Ashley was in a relationship with Kelly at the time of the first hearing. And, Ashley asked the children to keep her relationship with Kelly from the circuit court.
Ashley's argument that the circuit court employed a double standard in regard to her behavior is not well taken. The issue is not a weighted evaluation of moral failings. See Cranston v. Carroll , 97 Ark. App. 23, 242 S.W.3d 643 (2006) (stating that child-custody awards are not to reward or punish either parent). The issue is what is in the children's best interest. Moix v. Moix , 2013 Ark. 478, 430 S.W.3d 680. The Arkansas Supreme Court has considered immoral conduct to be a factor in determining whether circumstances have changed in cases that involve modification of custody. See Alphin v. Alphin , 364 Ark. 332, 219 S.W.3d 160 (2005) (citing Taylor v. Taylor , 353 Ark. 69, 110 S.W.3d 731 (2003) (noting that our supreme court has held that a parent's unmarried cohabitation with a romantic partner or a parent's promiscuous conduct in the presence of a child cannot be abided); Taylor v. Taylor , 345 Ark. 300, 47 S.W.3d 222 (2001) ; Hamilton v. Barrett , 337 Ark. 460, 989 S.W.2d 520 (1999) ; Word v. Remick , 75 Ark. App. 390, 58 S.W.3d 422 (2001) ); see also Stibich v. Stibich , 2016 Ark. App. 251, 491 S.W.3d 475 (holding that the circuit court properly considered the custodial parent's living with someone out of wedlock and having sex with that person in front of the children in determining that a material change in circumstances had occurred that warranted a change in custody).
Contrary to Ashley's contention, Joshua argues that Atkinson , supra , stands for the proposition that a party cannot use a finding that it is in one child's best interest that his custody be awarded to a parent to infer that it is in the sibling's best interest to be awarded to the same parent. We agree and note that the circuit court's consideration of the children's wishes is not required, but permissive. See Malone v. Malone , 4 Ark. App. 366, 631 S.W.2d 318 (1982).
A de novo review allows this court to affirm for any reason so long as it is correct. See Alphin , supra. Joshua argues that the children with him receive more consistent care, a more predictable living environment, clearly segregated sleeping arrangements, a clear school schedule that does not require any child to skip school for their parents' convenience, and a home in an area where they are intimately familiar. Accordingly, with the record before us, we hold that the circuit court was not clearly erroneous in finding that it was in the children's best interest to change custody to their dad.
IV. Contempt
The PSA required that Joshua pay Ashley $12,500 within 90 days following the decree. Ashley filed a motion for contempt for nonpayment of child support and the nonpayment of $12,500 owed to her pursuant to the PSA. The circuit court found Joshua in contempt on the PSA money and applied the amount owed as a partial offset to future child-support payments to be made by Ashley. Ashley must pay Joshua half of her child-support obligation with the other half being offset by the balance of the arrearage and the retirement payment owed to her.
Ashley argues that (1) the circuit court was without authority to modify the arrearages in child support by limiting her *510 ability to collect, and (2) the circuit court was without authority to modify the arrearages that accrued prior to Joshua filing a motion. She contends that when the child support became due and payable, it became a judgment that could not be modified. She also claims that the circuit court should have reduced the arrearages to a judgment and that she should be allowed to take whatever steps available to collect the past-due child support. Ashley also argues that the circuit court erred in allowing a setoff in child support for the payment of the $12,500 that Joshua owes her under the PSA. Citing Tiner v. Tiner , 2012 Ark. App. 483, 422 S.W.3d 178, she argues that the circuit court did not have the authority to modify the PSA to allow payments rather than a lump-sum payment. As in Tiner , Ashley contends that the modification gave Joshua relief rather than coercing him into paying a lump sum to purge his contempt.
However, Ashley did not object to the circuit court's ruling on these issues; thus, the arguments are not preserved for our review. Unless a party has no opportunity to object to a ruling of the circuit court, an objection must be made at the time of the ruling, and the objecting party must make known to the court the action desired and the grounds of the objection. Olson v. Olson , 2014 Ark. 537, at 7, 453 S.W.3d 128, 133. Accordingly, the circuit court's order regarding the child-support offset is affirmed.
Affirmed.
Virden and Vaught, JJ., agree.

Ashley gave birth to HC3 on December 5, 2015, and the final order reflects that Joshua is not her biological father; thus, the children subject to the custody dispute are HC1, AC, and HC2.