Cite as 2020 Ark. App. 407

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CV-19-452

| | | |
|---|---|---|
| CHRISTINE SKINNER (PREVIOUSLY SHAW) | APPELLANT | **Opinion Delivered:** September 16, 2020 |
| V. | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTEENTH DIVISION [NO. 60DR-08-2839] |
| BRANDON SHAW | APPELLEE | HONORABLE MORGAN E. WELCH, JUDGE |
| | | AFFIRMED |

## PHILLIP T. WHITEAKER, Judge

Appellant Christine Skinner appeals from an order of the Pulaski County Circuit Court granting appellee Brandon Shaw's petition for change of custody. On appeal, Christine argues that the circuit court erred in denying her motion to dismiss Brandon's petition on the basis of res judicata; in finding that a material change in circumstances existed to warrant a change of custody; and in concluding that the change of custody was in the child's best interest. We find no error and affirm.

I. *Factual and Procedural Background*

Christine and Brandon married in 2005 and have one daughter, L.S. The couple divorced in August 2009, and Christine was awarded primary custody of L.S. at that time, subject to Brandon's visitation. Christine subsequently married John Shaw, who had several other children, including a daughter, K.S.

In October 2016, L.S. informed Christine that her grandfather, Michael Maness (Christine's father) had touched her and K.S. inappropriately. This disclosure resulted in simultaneous but separate proceedings of child abuse and child custody.

In the child-abuse proceeding, Christine immediately reported the abuse to the Lonoke County Sheriff's Office, and an investigation commenced. The Lonoke County Sheriff's Office referred Christine and L.S. to the Wade Knox Child Advocacy Center, where both L.S. and Christine were interviewed. In her interview, Christine disclosed that Maness had abused her during her childhood. Maness was arrested and charged with two counts of rape and two counts of second-degree sexual assault for his abuse of L.S. and K.S. Additionally, the matter was referred to the Crimes Against Children Division (CACD) of the Arkansas State Police.

While the CACD and law enforcement investigations were still pending, Brandon initiated the child-custody proceeding by filing a motion for change of custody that sought ex parte emergency relief, citing the charges against Maness and alleging that Christine had concealed the sexual-abuse investigation from him.[1] The circuit court granted Brandon's motion, awarding him primary physical custody of L.S. until such time that a hearing could be held.[2]

After holding an emergency hearing, the court entered an order in which it continued primary physical custody of L.S. with Brandon pending a final hearing. The court

---

[1]Brandon's motion was filed on November 17, 2016.

[2]The order granting Brandon's ex parte emergency motion for change of custody was entered on November 18, 2016, and the emergency hearing was held on November 28.

2

also granted visitation to Christine with numerous restrictions; specifically, Maness was to have absolutely no contact with L.S., and Jan Maness, Christine's mother, was not to be present during Christine's overnight visitations, could not babysit L.S., and could not be left alone with L.S.

Meanwhile, in the child-abuse proceeding, CACD continued its investigation of Christine. It determined that Maness had pled guilty to the rape and first-degree sexual abuse of Christine in 1988. CACD ultimately recommended a true finding of neglect and failure to protect against Christine citing the fact that Christine had disclosed that her father abused her during her childhood years but still allowed the girls to be around Maness. Ultimately, CACD determined that Christine's name should be placed in the Child Maltreatment Central Registry. As a result of this true finding, the Arkansas Department of Human Services (DHS) filed a petition for dependency-neglect against Christine.

Christine appealed the CACD finding and sought a hearing before an administrative law judge (ALJ). The ALJ subsequently entered an order finding that the CACD erred in placing Christine's name on the child-maltreatment registry. Specifically, the ALJ found that there was insufficient evidence to show that Christine knew or should have known that Maness abused L.S. or K.S. before L.S. disclosed the abuse to Christine. Following the ALJ's decision, DHS dismissed its dependency-neglect action against Christine.

After the ALJ's order was entered in the child-abuse proceeding, Christine filed a motion in the child-custody proceeding seeking to dismiss Brandon's motion for change of custody. In her motion, she argued that the allegations advanced in Brandon's motion—specifically, the claim that she knew or should have known about the risk to L.S.—had been

3

fully litigated in the administrative hearing and addressed by the ALJ. Therefore, she contended, Brandon's claims should be barred by application of res judicata. She also alleged that Maness, the perpetrator of the abuse, had died and was no longer a threat.

The circuit court denied Christine's motion to dismiss. In doing so, the court rejected the idea that res judicata barred the claims in Brandon's custody motion and found that the issues litigated in the administrative proceeding were not the same as those being litigated in the custody proceeding. The court found that the issue pending before the ALJ was whether there was sufficient evidence to indicate a failure to protect, while the issue pending before the circuit court was whether there had been a material change in circumstances sufficient to warrant a change in custody. As such, the court found that res judicata did not bar the litigation of the issues presented in the custody case.

Brandon then filed a verified motion for permanent change of custody in August 2017. The circuit court held hearings on the motion over the course of several months in March and July 2018 and January 2019. On February 15, 2019, the circuit court entered its order granting Brandon's petition for change of custody. The court also ordered Christine to pay child support and concluded that Brandon was entitled to attorney's fees. Christine timely filed a notice of appeal.

## II. *Res Judicata*

In her first argument on appeal, Christine argues that the circuit court erred in denying her motion to dismiss Brandon's motion for change of custody. Specifically, she assigns error to the court's conclusion that res judicata did not bar relitigation of the issues presented in the change-of-custody proceeding that had been decided previously in the

4

DHS administrative proceedings. We review a circuit court's conclusions regarding the application of res judicata as a question of law, which this court reviews de novo. *Elsner v. Kalos Fin. Servs., Inc.*, 2012 Ark. App. 639.

Christine maintains that the issue-preclusion aspect of res judicata, or collateral estoppel, applies in this case. Decisions of an administrative board may be entitled to collateral-estoppel effect. *Beaver v. John Q. Hammons Hotels, Inc.*, 81 Ark. App. 413, 102 S.W.3d 903 (2003). Collateral estoppel, or issue preclusion, requires that four elements must be met before a determination is conclusive in a subsequent proceeding: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. *Ogborn v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 600, at 6, 532 S.W.3d 621, 625 (citing *Powell v. Lane*, 375 Ark. 178, 186, 289 S.W.3d 440, 445 (2008); *State Office of Child Support Enf't v. Willis*, 347 Ark. 6, 59 S.W.3d 438 (2001)). In addition, the party against whom collateral estoppel is asserted must have been a party to the earlier action and must have had a full and fair opportunity to litigate the issue in that first proceeding. *Id.* at 6–7, 532 S.W.3d at 625.

The circuit court found that the first element of collateral estoppel was not satisfied. We agree. In this case, the issue that was litigated in the administrative proceeding was whether Christine's name should be placed on the child-maltreatment registry for neglect or failure to protect because she knew or should have known that her father was abusing her daughter. The issue being litigated in the custody matter was whether a material change in circumstances had occurred that warranted a modification of the custody arrangement

between Christine and Brandon. Regarding this first element of collateral estoppel, the circuit court determined that "the evidentiary requirement to sustain a true finding of neglect in an administrative hearing is different than what is required to find misconduct of a party, poor parenting decisions, or parental neglect that may be grounds for a material change in circumstances." We hold that the circuit court correctly decided this question and affirm on this point.[3]

### III. *Material Change of Circumstances*

In her second point on appeal, Christine argues that the circuit court erred in finding that a material change in circumstances had occurred sufficient to warrant modifying custody. Our standard of review in custody matters is well settled. This court considers the evidence de novo and does not reverse unless the circuit court's findings of fact are clearly erroneous. *Cordell v. Cordell*, 2018 Ark. App. 521, 565 S.W.3d 500. A finding is clearly erroneous when, although there is evidence to support it, the court is left with a definite and firm conviction that the circuit court made a mistake. *Id.*

In custody-modification cases, courts impose more stringent standards than they do for initial determinations of custody in order to promote stability and continuity in the life of the child and to discourage the repeated litigation of the same issues. *Geren Williams v. Geren*, 2015 Ark. App. 197, at 10, 458 S.W.3d 759, 766. A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child or when there is a showing

---

[3]We also note that Brandon was not a party to the DHS administrative proceeding.

of facts affecting the best interest of the child that were either not presented to the trial court or were not known by the chancellor when the original custody order was entered. *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996). The party seeking to modify the custody order has the burden of showing a material change in circumstances. *Geren Williams*, *supra*. In order to change custody, the circuit court must first determine that a material change in circumstances has occurred since the last custody order; if that threshold requirement is met, it must then determine who should have custody, with the sole consideration being the best interest of the child. *Id.*

In its order changing custody from Christine to Brandon, the court found that the necessary material change in circumstances was demonstrated by Christine's "level of denial" concerning the abuse of L.S. and K.S. and the "abuse reports over time." Christine argues that the circuit court's findings were clearly erroneous because her father's abuse of L.S. had been mooted by Maness's death in April 2017. In support of her argument, she relies primarily on *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002). In that case, the circuit court granted the father's petition for custody modification when he alleged that the mother was going to relocate with their son to another state to live with her boyfriend. Our court reversed this decision, holding that the mother had ultimately decided not to move and had obeyed a court order to find her own residence in Arkansas; the relocation issue, this court stated, was therefore moot. *Vo*, 78 Ark. App. at 140–41, 79 S.W.3d at 392. Christine urges that *Vo* is instructive because her father' death renders the issue of any future abuse of L.S. moot, arguing that the circuit court erred because it relied on a material change in circumstances that was no longer pertinent at the time of the final hearing.

7

Christine's argument concerning the death of Maness is unavailing. The circuit court did not find a material change of circumstances because of the abuse perpetrated by Maness. Instead, the circuit court found a material change of circumstances on the basis of Christine's level of denial concerning the abuse of L.S. and K.S. Citing the testimony presented over multiple days of hearing, the court said it was "disturbed by the level of denial that mother and daughter, Ms. Maness and Ms. Skinner, have exhibited concerning the abuse of the children, the abuse reports over time, and I'm concerned about that." The court's focus was therefore not on the specific act of abuse perpetrated by a man who had since died but on the more global issue of Christine's inability to protect her daughter and to confront the reality of what had happened.

Evidence introduced at the hearing supports the circuit court's finding on this issue. Tanya Cross, an investigator with CACD, interviewed Christine about the abuse of K.S. During this interview, Christine stated that the abuse was not the child's fault but described K.S. as "hypersexualized." Christine expounded on this by opining that Maness approached K.S. "the first time" but that K.S. "went back each time seeking attention." Cross specifically asked Christine why she would let her children be around Maness since she had been abused by him as a child. Christine responded that Maness had prayed and repented of his sins. Cross testified that over the course of her investigation, Christine had become less honest and more evasive with her.

In her response to Cross's testimony, Christine testified that Investigator Cross's report "got all of it wrong." She denied telling Cross that she had been the victim of sexual abuse by her father, saying that she told Cross she did not know why her father had been

8

arrested when she was a girl. She also denied numerous other statements that Cross had written in her report and claimed that Cross had changed the wording of many of her statements. Christine asserted her belief that many of the investigative notes were "exaggerated" or "even just made up."

Other evidence also supports the circuit court's finding of material change. The court heard evidence that both Christine and her husband received information in 2011 that Maness had sexually assaulted another victim within the family. Investigator Cross testified that both Christine and her husband, John, refused to provide her with contact information for this relative. Christine acknowledged that she received a warning in 2011 about Maness's abuse of her cousin, but she took no precautions regarding her own children because she "felt like it was a false allegation." She further agreed that after being told by this cousin that Maness had abused him, she did not tell Brandon about it.

Further, L.S.'s counselor, Elizabeth Knight, testified that Christine minimized what happened to L.S. and K.S., saying that L.S. was "just touched a few times." Knight added that Christine was not primarily focused on the abuse that L.S. had suffered and "seemed to lack empathy and have an emotional disconnect," whereas Brandon was "consistently concerned with why L.S. was in treatment." Moreover, Christine did not tell Knight about her father's death, which "hindered the treatment process."

At the final hearing, Christine repeatedly denied realizing that her father had sexually abused her as a child. She only recalled that he had "hurt" her during a bath and claimed that she did not know that "it was of a sexual nature or that it pointed to my dad being the monster that he was." She also reiterated her claim that the CACD investigators fabricated

evidence. When asked by the attorney ad litem if she had ever apologized to L.S., Christine said she "assume[d] [she] apologized for what happened to her. She added, "I can't apologize for the act, because I didn't commit the act. . . . Having the knowledge that I had at the time that it happened, I feel no responsibility."

Brandon testified that he did not believe Christine understood the gravity of the situation. He added that he blamed her for allowing the abuse to happen and said that he believed she knew what had happened to her and "just turned a blind eye to those things potentially happening to L.S. and K.S."

We give due deference to the circuit court's superior position to judge the credibility of the witnesses. *Id.* The Arkansas Supreme Court has held that there is no other case in which the superior position, ability, and opportunity of the circuit court to observe the parties carry a greater weight than one involving the custody of minor children. *Taylor v. Taylor*, 345 Ark. 300, 304, 47 S.W.3d 222, 224 (2001). On the basis of the above testimony and given our deference to the circuit court's assessment of the credibility of the witnesses, we cannot say that the circuit court clearly erred when it found a material change in circumstances on the basis of "the level of denial that [Christine has] exhibited concerning the abuse of the children, the abuse reports over time." We therefore affirm the circuit court's findings regarding a material change in circumstances.

IV. *Best Interest*

In her third point on appeal, Christine contends that even assuming a material change in circumstances occurred, the circuit court nonetheless erred in finding that a change of custody would be in L.S.'s best interest. The best interest of the children is the polestar in

10

every child-custody case; all other considerations are secondary. *Cordell*, 2018 Ark. App. 521, at 13, 565 S.W.3d at 506. In deciding whether a modification of custody is in a child's best interest, the circuit court should consider factors such as the psychological relationship between the parents and the child, the need for stability and continuity in the relationship between parents and the child, the past conduct of the parents toward the child, and the reasonable preference of the child. *Dorrell v. Dorrell*, 2014 Ark. App. 496, at 8, 441 S.W.3d 925, 930.

On appeal, Christine complains first that the circuit court made no specific findings as to why it found the change of custody to be in L.S.'s best interest. The court's order, however, noted that it had charged the attorney ad litem with investigating the matter and producing a report concerning the best interest of the child, and it expressly accepted the ad litem's recommendation that the change of custody was in L.S.'s best interest.[4] Although the order is otherwise silent about which facts and factors the court took into account, there is a presumption that the court made the findings necessary to support its judgment. *Emis v. Emis*, 2017 Ark. App. 372, at 9, 524 S.W.3d 444, 450.

The remainder of Christine's argument recites testimony from the hearings to support her contention that it would have been in L.S.'s best interest to remain in her custody. At its core, however, her argument is little more than an invitation for this court to reweigh the evidence. This is something we will not do. *See Szwedo v. Cyrus*, 2020 Ark.

---

[4]The court appointed an attorney ad litem to represent the best interests of L.S. during the earlier stages of the custody proceeding.

11

App. 319, at 17, 602 S.W.3d 759, 770; *Schreckhise v. Parry*, 2019 Ark. App. 48, at 8, 568 S.W.3d 782, 787. As we have frequently stated, there are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. *Williams v. Williams*, 2019 Ark. App. 186, 575 S.W.3d 156; *Gibson v. Gibson*, 2010 Ark. App. 741; *see also Hart v. Hart*, 2013 Ark. App. 714, at 2 ("Deference is especially important in custody cases because the [circuit] court is in the best position to view and judge the witnesses and the best interest of the child."). Given the special deference we accord to the circuit court's evaluation of a child's best interest, *Williams*, *supra*, we affirm the court's best-interest determination in this case.[5]

Affirmed.

GRUBER, C.J., and ABRAMSON, KLAPPENBACH, and MURPHY, JJ., agree.

HIXSON, J., dissents.

**KENNETH S. HIXSON, Judge, dissenting**. Sins of the father are not visited upon his children. And the sins of a father should not, and cannot, be a substitute for substantive evidence. The record shows that Christine is a thirty-seven-year-old mother and, by all accounts, a good mother. Christine was, and still is, the victim of sexual abuse that occurred when she was four years old by her father, Michael Maness. As is typical with child sexual-abuse victims, Christine did not remember the details of the abuse inflicted upon her. Her repressed recollection was limited to simply remembering her father was hurting her when

---

[5]Christine raises a fourth enumerated point on appeal, but it simply asks that if we reverse on any of her arguments on appeal, we reverse the order awarding Brandon child support and attorney's fees as well. Because we affirm, it is unnecessary to address this point further.

giving her a bath. Four-year-old Christine told her mother that she did not want her father giving her baths any longer. And the baths stopped. No further discussion took place between the four-year-old child and her mother.

Unknown to Christine at that time in 1988, her mother had courageously reported her husband to local law enforcement for the sexual abuse to her four-year-old child. Mr. Maness was subsequently arrested and pleaded guilty in 1988 to first-degree sexual abuse. Mr. Maness was sentenced to probation and underwent counseling individually and with his wife. In 1993, after completing therapy and other conditions of probation, Mr. Maness's record of sexual abuse was expunged by the Pulaski County Circuit Court, and for reasons not set forth in the order, Mr. Maness was not required to register on any sex-offender lists. Christine's only recollection of these events is that her father did not live with the family for several months but that he later returned home.

Twenty-eight years later, in 2016, Christine became shockingly aware of the ugly details of her father's child abuse, arrest, prosecution, guilty plea, and sentencing that occurred in 1988. After LS informed Christine that Mr. Maness had touched her inappropriately, Christine confronted her mother with the allegations. For the first time, Christine's mother provided her with the sordid and horrific details of her father's child sex abuse committed against her. At the trial, Christine testified that in retrospect, as she was growing up, she never saw her father as a child molester. It is with this background that the facts of this case took place.

Turning to the evidence before the trial court, I will begin with Christine's testimony. Christine and Brandon Shaw have a daughter, LS, now age 14. Christine

testified that she is a nurse and is married to John Skinner (Skinner). Christine and Skinner have custody of Skinner's two minor children from a prior relationship and previously had custody of Skinner's third child who is now a young adult. Christine also has joint custody of a son who was born to Christine and another man. Christine formerly had custody of the child at issue here, LS, but at the time of the final hearing, LS was in the temporary custody of appellee Brandon Shaw. *All of these minor children still reside today in Christine's residence where she is the primary caregiver; only LS has been removed. None of these other minor children have been removed.*

Christine testified that she would sometimes let her children and stepchildren visit and spend the night with her parents, Mike and Jan Maness. According to Christine, both of her parents were always there together when this visitation occurred. On the night of October 26, 2016, one of Christine's stepdaughters (KS) told Christine that Mike Maness had touched her inappropriately. After learning this, Christine asked LS if Mr. Maness had inappropriately touched her, and LS responded that he had done so three times over the past year. Christine testified that she believed both girls' accounts, and she immediately and unequivocally made the decision to never to let them be in contact with her father, Mike Maness, again. Christine first heard the allegations around 9:00 p.m., and the very next morning after dropping the children off at school, Christine drove to the sheriff's department and reported the sexual-abuse allegations to the sheriff.

Christine maintained that she had no reason to believe her father was abusing any of the children prior to the abuse being reported. She stated that until then, both of her parents

were very involved in her children's lives and that she thought Mr. Maness had been a good grandfather to them.

There is no evidence in the record that shows Christine was remotely aware that her father was a child abuser; however, the state police investigation and testimony at trial placed a deal great of emphasis on an episode that occurred in 2011. Christine was interrogated about a 2011 Facebook post wherein her cousin's wife had accused Mr. Maness of sexually abusing Christine's cousin (her husband) forty-some-odd years ago when he was a small child. This would have been approximately seven years before Christine was born. According to Christine, in 2011 she confronted this claim by speaking directly with her cousin and with her father about the accusation. Christine's cousin indicated to Christine that nothing inappropriate had happened, and Christine's father told her he had done nothing wrong with respect to Christine's cousin. Christine stated that at that time, her father apologized to her for hurting her in the bathtub when she was four years old, stating that he did not mean to hurt her. Christine claimed that she did not know she had been "sexually hurt" but thought only that her father had been washing too roughly (recall, this is five years before Christine's mother provided her with the details of her father's sexual abuse.) According to Christine, during this 2011 conversation, her father told her he had repented to God for hurting his child, that he would never hurt another child, and that he had never hurt anyone since.

Christine indicated that she has a good relationship with LS and that LS "wants to come home." Christine testified that LS has a good relationship with her father, Brandon,

15

but that LS told her she does not want to live with her father and wants to live with her mom.

Brandon testified that he had remarried but was separated, so it was just he and LS who were living in his house pursuant to the temporary order of custody. Brandon did acknowledge that LS wants to live with her mom, and he stated that "I'm not questioning that." However, Brandon thought that LS did not understand the gravity of the situation. Brandon's primary concern was Christine's alleged failure to protect LS from the sexual abuse committed by Christine's father (who has since passed away). Brandon thought that Christine could have done more to prevent Mr. Maness from molesting LS, and he blamed Christine for allowing it to happen. This is appellee's allegation of a material change in circumstances that warranted the change of custody.

Tanya Cross, an investigator for the Arkansas State Police Crimes Against Children Division (CACD), testified about her investigation of Christine that occurred after the sexual abuse committed by Mr. Maness was reported. As a result of Ms. Cross's investigation, she made a true finding against Christine for maltreatment of LS—specifically neglect and failure to protect—*primarily, as a result her being a victim of child sex abuse herself and allowing LS to visit with her father, the abuser*.

However, Christine appealed Ms. Cross's decision to the Office of Appeals and Hearings (OAH) division of the Arkansas Department of Human Services (DHS), and the decision was overturned. The OAH order that reversed the finding of maltreatment against Christine was admitted into evidence without objection. The specific findings in that order are particularly pertinent. For clarification, in the OAH findings, Christine is referred to as

16

Ms. Skinner.  Additionally, although this custody case pertains only to LS, Mr. Maness also abused LS's half sister, KS, during this same time period.  The CACD investigation included references to both LS and KS.  These pertinent findings in the record are as follows:

3. Knew or Should Have Known: *There is insufficient evidence to show Ms. Skinner knew or should have known of sexual abuse to LS and KS by Mike Maness prior to LS and KS's disclosure of sexual abuse based on the following*:  First, neither LS nor KS disclosed that they had told Ms. Skinner about the sexual abuse prior to the time leading to the investigation.

. . . .

Second, the allegations against Ms. Skinner are based primarily on Ms. Skinner's allegedly acknowledging sexual abuse to her by Mr. Maness until she was a teenager.  However, Ms. Skinner denied that she was subjected to sexual abuse other than the one occasion when she was approximately four years old, which was more than twenty-five years prior to the incident with LS and KS. . . . *I cannot find [CACD] assumptions to be a credible foundation for allegations of maltreatment, especially when considering Ms. Skinner was present, was talking to [CACD] Detective Counts and Ms. Cross, and neither asked Christine what Mr. Maness did.*

Third, according to the evidence presented, Mr. Maness' criminal record regarding Ms. Skinner was expunged, there was *no requirement of sex offender registration*, Mr. Maness received counseling, and was consequently allowed back in the home with Ms. Skinner.  *I find these facts, in part determined by the Circuit Court of Pulaski County, Arkansas, combined with the evidence that more than twenty-five years had passed between the time Mr. Maness sexually abused Ms. Skinner and the incidents involving LS and KS and the lack of credible evidence of sexual abuse during that time frame to weigh against the allegations that Ms. Skinner knew or should have known that Mr. Maness was likely to sexually abuse LS and KS.*

Fourth, additional allegations have emerged as the result of the investigation that Mr. Maness abused another relative in, or about, 1981 when that relative was approximately five years old.  *However, there was insufficient evidence to show exactly what, if anything, Ms. Skinner knew of this incident.  The incident was alleged to have occurred approximately seven years before Ms. Skinner was born.*

. . . .

5. Reasonable action:  As there is insufficient evidence to show Ms. Skinner knew or should have known of sexual abuse to LS and KS by Mike Maness prior to LS and KS's disclosure of sexual abuse, *there is insufficient evidence to show Ms. Skinner*

*failed to take reasonable action to protect KS and LS from the sexual abuse prior to disclosure. However, after Ms. Skinner became aware of the sexual abuse to LS and KS, I find Ms. Skinner's actions of immediately taking the children to the sheriff's department to report the allegations and keeping the children away from Mr. Maness to be reasonable.*

(Emphasis added.) And it is not a small matter that not only did CACD charge Christine with maltreatment, the Arkansas Department of Human Services filed an independent action against Christine alleging she was guilty of child neglect. It should not be overlooked that shortly after the OAH reversed the finding of maltreatment against Christine, DHS voluntarily dismissed its petition, and the dependency–neglect case was closed.

Also in evidence was the report from a *court-ordered* psychological evaluation of Christine. In the psychological report, the psychologist stated that Christine acknowledged having been sexually abused by her father when she was four years old but that Christine adamantly denied he had abused her after that. Christine reported having a strong faith and said that she forgave her father and believed he had changed and was no longer a threat to anyone. The psychologist reported that Christine did not appear to have the personality or psychological characteristics that would cause her to neglect or abuse her daughter. The report stated that Christine definitely views herself as the primary caretaker of LS as well as the other children in her care and that she strongly identifies with her role as a mother. The report further stated that Christine appears to have appropriate house boundaries and rules and that she immediately responded to LS's and her stepdaughter's disclosure of sexual abuse by immediately stopping all contact between the children and her father. It was noted in the report that Christine reported no mental-health problems and had been successful in her nursing career and was attending pharmacy school at Harding. The report concluded that from the evaluation, there were no major concerns about Christine's ability to parent LS as

18

she appears to provide a loving, structured, and consistent environment for her children and is a well-functioning adult. The psychologist also testified at the hearing that Christine did not appear to be someone who knew there was a risk of danger and disregarded it and put her child in harm's way.

During closing arguments, LS's attorney ad litem acknowledged that LS wished to be in her mother's custody. However, against LS's wishes, the ad litem recommended that LS be placed in the primary custody of her father.

In my view, the trial court clearly erred in deciding the threshold issue of whether there had been a material change in circumstances. In the trial court's order, it found that "there is a material change in circumstances that has been shown . . . *that have taken place over the past ten months.*" (Emphasis added.) Although the trial court did not specifically state what the changed circumstances were, in a separate part of the order it made these "Findings Pertaining to Abuse": "The court does not find that Christine participated in the abuse of her daughter, nor does the court find, for that matter, that Jan Maness did. *The court does find and is disturbed by the level of denial that mother and daughter, Jan Maness and Christine, have exhibited concerning the abuse of the children, the abuse reports over time, and the court is concerned about that.*" (Emphasis added.) The above findings are apparently directed, at least in part, to the trial court's finding of a material change in circumstances. Since the trial court found a material change of circumstances "over the past ten months," a review of what did or did not occur during the past ten months is imperative.

The final custody hearing was held on January 10, 2019, and the final order changing custody was entered on February 15, 2019. That begs the question: what was the material

change of circumstances that occurred during the "last ten months"?  Obviously, it cannot be the sexual assault of the two girls that was revealed more than two years earlier in October 2016.  Similarly, it cannot be a failure to protect LS from the sexual assault that occurred more than two years earlier in October 2016.  And it cannot be Christine's failure to protect LS from a father who is now dead.  So, what is the material change in circumstances?  The order tells us: "*The court does find and is disturbed by the <u>level of denial</u> that mother and daughter, Jan Maness and Christine, have exhibited concerning the abuse of the children, the abuse reports over time, and the court is concerned about that.*"  (Emphasis added.)  But what evidence is there that Christine denied that the abuse occurred?  Christine testified she believed both girls from the very beginning, confronted the sexual abuse immediately head on, and turned in her own father to the sheriff the following morning.  Not only did she turn in her father for a felony for which he would most likely spend the rest of his life in prison, she prohibited all contact between her father and the girls.  Even after the initial sequence of events, she actively participated in therapy sessions with the girls.  That is not denial.

To the extent Christine may have exhibited a negative attitude during portions of the administrative and court proceedings, this would not be an atypical response from a parent who courageously turned in her own father for sexual abuse and was then herself accused of maltreating and neglecting her child.  Christine may have had a jaded eye toward CACD, DHS, and even the court system; but I cannot conclude that Christine's post-

disclosure conduct rose to the level of a material change in circumstances such to open (and close) the issue of whether a change in custody was in LS's best interest.[1]

I acknowledge that even when the trial court fails to make findings of fact about a change in circumstances, this court, under its de novo review, may nonetheless conclude that there was sufficient evidence from which the trial court could have found a material change in circumstances. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999). But not only does the record fail to reflect that Christine was in denial of the sexual assaults over the past ten months, the record reflects that Mr. Maness died in 2017, and so the threat of him sexually abusing LS again has been completely extinguished. Christine cites *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002), for the proposition that when an alleged change in circumstances is no longer pertinent or has been remedied by the time of the final change-of-custody hearing, then the alleged change is moot and cannot constitute a material change in circumstances. Mr. Maness is obviously no longer a threat to LS, and the evidence showed that Christine is capable of protecting LS from harm.

The court-ordered psychologist concluded in her report that Christine did not exhibit characteristics that would cause her to neglect or abuse her daughter and further concluded that there were no major concerns about Christine's ability to parent and provide a loving, structured environment for the child. Obviously the trial court was not concerned

---

[1]Perhaps just as important, whether the child's grandmother, Jan Maness, was in denial should not be relevant to a material change of circumstances in the last ten months for purposes of parental custody. Perhaps it would be relevant to grandparent's visitation; but not to whether Christine should have custody of the child.

with Christine's ability to protect LS because in the order changing custody, the trial court awarded Christine standard, unsupervised overnight visitation. And it cannot be ignored that DHS withdrew its petition for dependency/neglect, and four other minors still reside in Christine's home.

Because the proof did not show that Christine was unable to protect her child from harm, I do not believe this can be the foundation to support a material change in circumstances. I am left with a definite and firm conviction that the trial court made a mistake in finding a material change in circumstances, and I would reverse the order changing custody.

Alternatively, even were I to agree that there was proof of a material change in circumstances, I would nonetheless reverse the custody order because the trial court clearly erred in finding that a change in custody was in the child's best interest. The court-appointed psychologist who evaluated Christine found that Christine was emotionally and behaviorally stable, provided a suitable home with proper rules and boundaries, and showed no characteristics that would lead the psychologist to believe that Christine would neglect or abuse her child. Both of LS's parents and the attorney ad litem all agreed that LS wants to be in her mother's custody. Although a child's preference about living with a particular parent is not binding on the trial court, it is a factor for the trial court to consider. *Williams v. Williams*, 2019 Ark. App. 186, 575 S.W.3d 156. The record shows that Christine has provided and can continue to provide LS a favorable and safe environment in her custody, and I am firmly convinced that the trial court erred in finding that a custody change was in LS's best interest.

As it stands today, Christine was, and always will be, a victim of the child sexual abuse inflicted on her when she was only four years old. The victimization does not go away. That wound was ripped open twenty-eight years later in October 2016. Because Christine was a victim of child sexual abuse, she apparently either should have been clairvoyant and known her father was going to abuse LS and protected her from him; or she should have had a better attitude when she was accused of neglecting and maltreating her daughter. Neither of these inappropriate reasons should cause Christine to lose custody of LS.

Finally, I am concerned that this decision will adversely affect the progress society has made in dealing with the victims of child sex abuse. Why would any mother who is herself the victim of child abuse report the child abuse of her own child when the result is that she will be accused by CACD of maltreating her child, be accused of dependency-neglect by DHS, and risk losing custody of her child? While I am not suggesting that the court system is a placeholder for society's ills; I am suggesting that we should, and must, carefully review the substantive evidence that purportedly constitutes a material change in circumstances for purposes of child custody instead of, as the OAH order astutely states, relying on assumptions.

Also, I would be remiss if I did not add that I would reverse the attorney fees that the court awarded the appellee. Not only did Christine defend a motion for change of custody; she simultaneously defended a charge of maltreatment by CADC and a charge of neglect by DHS. At what cost? Not only did Christine incur her own legal fees fighting for her daughter and defending her character; the court ordered her to pay another $59,000

23

in attorney fees to appellee on top of that. It is clear that the sins of the father permeate every facet of this litigation and not any alleged misconduct of the victim.

For these reasons, I dissent from the majority and would reverse the trial court's order changing custody.[2]

*Taylor & Taylor Law Firm, P.A.*, by: *Andrew M. Taylor*, *Tasha C. Taylor*, and *Jennifer Williams Flinn*, for appellant.

*Coplin & Hardy, PLLC*, by: *Betty J. Hardy*, for appellee.

---

[2]I agree with the majority's conclusion that res judicata does not apply to this change-of-custody proceeding for the reasons expressed in their opinion.