Cite as 2020 Ark. App. 541

# ARKANSAS COURT OF APPEALS
DIVISION III
No. CV–20–140

| | |
|---|---|
| COURTLAND FAULKNER<br><br>APPELLANT<br><br>V.<br><br>DANIEL MCCAIN<br><br>APPELLEE | **OPINION DELIVERED:** DECEMBER 2, 2020<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTEENTH DIVISION [NO. 60DR-14-1287]<br><br>HONORABLE MORGAN E. WELCH, JUDGE<br><br>AFFIRMED |

## ROBERT J. GLADWIN, Judge

Courtland Faulkner appeals the Pulaski County Circuit Court order changing custody of her daughter to appellee Daniel McCain. On appeal, Faulkner argues that the circuit court erred when it found a material change in circumstances and that it was in the child's best interest to change custody to McCain. We affirm.

### I. *Facts*

This case began in 2014 with competing complaints to establish paternity of JM (born June 2013). On September 18, 2017, the parties filed an agreed order that named McCain as JM's father, awarded primary physical custody to Faulkner, and awarded joint legal custody to both parties. Also, a visitation schedule was set, and child support was established.

On January 24, 2019, Faulkner filed a motion to modify visitation and increase child support, and on April 24, an attorney ad litem was appointed to represent JM. At the hearing on May 13, Faulkner testified that she had filed the motion to reduce summer

visitation because when JM, then age five, returned from extended visits with her father, her behavior was so extreme that she was removed from a regular classroom and placed into an alternative school. She said that at the beginning of the school year, JM would throw fits in the classroom, throw her shoes, hit other students, and scream at adults. This behavior resurfaced in December, and JM was removed from the classroom for not listening. JM proceeded to the principal's office and spit at, swung at, and became aggressive toward the administrative assistant. She said that after JM talked to Paige Sullivan, Faulkner's life partner, JM's behavior improved; but it escalated later in the day, and JM began throwing her backpack, calling teachers "buttholes," and making comments that the teachers could call Paige or her mother because she was going to her dad's.

Faulkner said that McCain, who lives in Oklahoma, had never kept JM for more than three weeks. She said that she never denies McCain visitation when he comes to town, that she is willing to work with him throughout the year, and that JM's behavior has a direct correlation with her extended stays with McCain. JM takes Focalin, a medication for her ADHD, and the ad litem's report states that the medication began in March 2019.

On cross-examination, Faulkner said that JM had been in therapy and that "I'm currently in the process of finding her a new therapist." She said that JM last saw her therapist in March and that she felt like JM needed more therapy and independent therapy. She said that JM was diagnosed in November 2018 and that she thought it was in JM's best interest to be at home for at least five weeks before school starts so that she could quickly transition back into a regular classroom. When questioned by the court, Faulkner said that

2

JM had quit going to therapy after March because "[h]er therapist felt that she had benefited all that she could" from the child-directed interaction therapy.

The hearing was not completed, and it was continued to August 12. In the meantime, on July 12, McCain filed a motion to modify custody and visitation, alleging a material change in circumstances affecting JM's best interest. McCain alleged that JM, then age six, had begun exhibiting extremely abnormal behaviors since the entry of the agreed order and that she had been suspended from school repeatedly and had been transferred to an alternative school. JM was evaluated by a psychologist and diagnosed with ADHD and an adjustment disorder, and the psychologist recommended individual and family therapy. McCain alleged that the therapy had not occurred on a regular basis and that Faulkner's attempts to discipline the child were ineffective or inappropriate. He alleged that Faulkner had delegated much of JM's discipline to Paige, her significant other, and had allowed JM to be paddled at school. He also alleged that Paige had JM handcuffed and placed into the backseat of a patrol car. He claimed that Faulkner had not involved him in any decision regarding the child's treatment or discipline and did not foster a positive relationship between him and JM. In her response to McCain's motion, Faulkner alleged that McCain was the direct reason for JM's negative emotional and behavioral change.

When the hearing resumed on August 12, the circuit court administratively dismissed without prejudice the motion to limit summer visitation because it had already occurred. The court took up the motion for change of custody on a temporary basis stating, "I'm going to use this time to take a snapshot of the welfare of the child."

3

Faulkner testified that JM was beginning the school year at an alternative school but would be transitioning to Northside Elementary in Cabot after the first two weeks. She said that to correct JM's behaviors, she had tried several approaches—positive reinforcements, redirecting, corporal punishment, and removing things and having JM earn them back with appropriate behavior. She said that when she removed "everything" from JM's room, she meant "the big items that are easily accessible," and she denied that she had ever left the child in a bare room.

Faulkner said that following spring break 2019, she spanked JM for calling her a mean witch. She also spanked JM in December 2018, explaining that JM had spoken with her dad on the phone, and when she was in bed for the night, she wanted to speak with her dad again. When she was told she could not, she became very aggressive and hit Faulkner in the stomach, kicked her in the shins, and threw a baby stroller and other objects in her room. Faulkner "ended up popping her on the bottom" and then later allowed JM to call McCain. She also said that she went to the school to spank JM in December 2018 and had given the school permission to spank JM in the fall of 2018 and early in 2019.

Faulkner said that the last time Paige physically disciplined JM was in June 2018 when she "attempted to place a scare tactic method" on JM. She thought it was okay for Paige to discipline JM because Paige is her partner and a primary caregiver for JM. "If she is not allowed to correct the behavior that is displayed while [JM] is with her, then [JM] will not show her respect and will never listen." She denied sending Paige to school to deal with JM's discipline problems but said that she had sent Paige to the school to "help in redirecting [JM] when she was having behavior problems" because Faulkner "may have

4

already left work once or twice that week" to go to the school. When asked if it was appropriate to spank a child with the diagnosis of ADHD with emotional disturbance and conduct, she said she did not know of JM's diagnosis until November 2018 and that she was doing her best to figure out how to deal with a child who had those particular disorders, and she now believes it is not appropriate to spank JM. She said that the therapist advised her in December 2018 that spanking was not a good approach, and she admitted that after she received that advice, she spanked JM.

Faulkner said that JM's bedtime is no later than 7:30 p.m. and no earlier than 7:15 p.m. and that she is the primary disciplinarian at home. She said that JM began therapy in January, and she attended five sessions until March. She said the next step in JM's therapy is parent-directed instruction, which provides ways for parents to effectively instruct children and discipline them when instructions are not followed. She said that those sessions had not begun, that JM started therapy "last week," and that the therapy was a booster session for the five sessions she had earlier in the year. She said that Paige would be attending the next session and possibly the one after that because the relationship between JM and Paige had been distressed since JM returned from summer visitation.

Faulkner said that it is entirely McCain's fault that JM behaves the way that she does, that McCain does not provide structure, uniformity, or discipline when JM visits, and that JM reacts negatively when she "has those" at Faulkner's house. She said that JM should be able to see McCain whenever she wants and when a visit can be accommodated. When she enrolled JM in school, Faulkner did not put McCain's name on the paperwork. She said that she had tried to consult with McCain on decisions about school and medical care but

5

that he does not wish to coparent with her. She did not contact McCain before she had JM's medication increased after summer visitation, and she did not ask him if he thought JM needed it or if he had a method to help JM get to sleep at night.

Faulkner said that the therapist, Dr. Jason Lagory, did not want to begin the parent-directed-instruction sessions after the child-directed sessions had concluded on March 25 because JM was going to go to McCain's house for the summer. Faulkner said that the therapist instructed her to continue sessions at home with "special playtime."

Faulkner said that around Christmas 2018, she decided to punish JM for her school suspension by taking away her Christmas. She later decided to remove JM's presents and allow her to earn them back one by one. She denied that she prioritizes Paige over JM.

Paige testified that she had been in a relationship with Faulkner for a little over two years and that they had lived together for a year and a half. She said that she sometimes disciplines JM and had spanked her six months to a year ago, but she said that she no longer thinks spanking is appropriate. Paige works for the Arkansas Department of Community Correction as a parole officer. She said that she had once brought home from work a van with a cage in the back, and JM got into the back, but she denied that she had put JM in the van. When asked if she had handcuffed JM, she said, "Yes, Ma'am. Not me particularly, no, but there was an instance where that had happened. Yes." She explained,

> It was June 7th of 2018. . . . [JM] had gotten in trouble at daycare. They could not do anything else with her because she was hitting and spitting on the employees as well as other children at the daycare, which is Cabot zoned.
>
> [Faulkner] had already taken off once that week to go get her and she could not take off anymore, so she called me. . . . [JM] had to come back to work with me. When I got back to work, me and another coworker had talked about it prior.

6

And when I say that, they knew about everything that had been going on. I got [JM] in my office. She started acting up, and I started explaining to her her actions.

What I mean by that is, when I started talking to her she asked what happens to bad guys when—because I was at work, of course. And I said, "Well, bad guys have consequences." And I said, "And that's where we correct that."

And she was like, "Well, I don't understand." And she started getting sassy and all of that. I explained to her that her actions of hitting and spitting on adults, as well as other students, can turn into more if she thinks it's okay.

And that's when I showed her handcuffs and that's when that—I had put them on her. I handcuffed her in the front. They did not fit her. They're adult handcuffs. So I held them there, and I was like, "These are what are used when bad guys get in trouble."

And she was like, "Well, I don't want to go to jail."

And I was like, Baby, you're not going to go to jail, but you do need to understand that, you know, if you keep continuously doing that—because with my experience and with my education and training, I've been—I know that kids, when they think things are okay, they grow up to adults that think things—think that the same actions are okay.

She started crying. I took them off. It was maybe—wasn't even on there a minute. I'd probably say closer to the 30-second range. She started crying. I slipped them off. When I say slipped, because they did not fit, so I just literally pulled them off. I stated to her that she is not going to jail, that that was never the intention of me, taking her to jail. I said, "But you need to know that with your actions are consequences," and that's what I implemented to her, reality.

Paige said that this incident took place the day after JM's fifth birthday. She said that Faulkner is the primary disciplinarian and that since the last court date, she does not discipline JM; but if JM misbehaves, she tells her to go to her room until her mom gets home. When asked if they had ever taken everything out of JM's room, Paige said, "I want to say twice of everything . . . . [a]nd that means everything." She said the longest they made JM stay in her room without her things was thirty minutes.

7

Because the hearing ended without being completed, the circuit court filed an interim order on August 21. Among other things, the parents were ordered to be JM's sole disciplinarians, and no corporal punishment was permitted.

At the final hearing held on September 24, McCain testified that he works nights from 10 p.m. to 8 a.m. as a patrol supervisor for the Oklahoma City Community College Police Department and that he has been involved in JM's life since she was born. Shortly after JM's birth, Faulkner moved to Arkansas, so they shared custody until he was deployed in 2017, exchanging JM every two weeks. He said that because she would have JM full time, Faulkner asked for child support, and they signed an agreed order a couple of weeks before he deployed in September 2017.

McCain said that before his deployment, he and Faulkner communicated very well and talked often about JM. He said that once the papers were signed, Faulkner quit cooperating with him. He said it was hard to communicate with him while in Afghanistan, but once he returned, Faulkner did not include him in any decisions. Faulkner would not allow JM to be in Oklahoma for his homecoming ceremony when he returned from Afghanistan. A couple of days after he was home, he drove to Arkansas to see JM. At first, Faulkner agreed to the visit, but while driving to see JM, McCain received a phone call from Faulkner, who said that she needed to have JM home at a certain time, that JM would not be allowed to stay with McCain in his hotel, and that he could not take JM to school. He said that later, Faulkner "gave in," but she sent him text messages asking him not to tell anyone because Paige would be very upset and that she was "doing him a solid" by allowing him to take JM to school. He said that Faulkner gave him an address, but when he arrived,

it was JM's daycare address, not her school. When Faulkner agreed to allow him to take JM to school, she provided the actual school address. He asked to be able to eat lunch with JM, but he was not listed as JM's parent at school, and he had to be added to the list.

McCain said that his work schedule would allow him to be available for JM from the time she goes to school until she goes to bed at night. He said that when JM spent the summer with him, it went well, and there had been only minor issues—"no more than a six-year-old temper tantrum here and there." During visitation, JM stayed with his other family members at times, and she attended a couple of summer camps. He said that they kept JM active, and he explained that he disciplines her by taking away privileges like sidewalk chalk. He said that this seemed effective and that positive motivation and encouragement improved her behavior.

McCain said that when he had JM for the summer, Faulkner had sent a prescription that needed to be filled. However, when it could not be filled on time, Faulkner told him that JM would be fine without her medication for a couple of days. After a couple of days, he felt like JM was more active and playful, and he decided not to give her the medication since Faulkner had said there would be no withdrawals. He said that he is not adamantly opposed to JM being on medication, but he wants to explore other options.

McCain said that he quit trying to communicate with Faulkner because he got the "cold shoulder" from her. He said that if JM were to live with him, she would have her own room and that he had met with the principal from Piedmont Elementary, whose child is also diagnosed with ADHD. He said that the principal and the school counselor have worked together to keep very active kids in a normal classroom, and McCain does not think

9

JM should be in an alternative school. He also said that he was not notified either before JM was put on medication or when she was put on the second medication after summer visitation. He said that the second medication was to help JM get to sleep and that she had no trouble sleeping when she was at his house. He said that because of the current court case, there had been no problem communicating with Faulkner for the last three weeks.

McCain said that he learned about JM's school suspension when Faulkner told him that JM was not allowed to have Christmas either at her house or at his house. She told him that if he was planning to allow JM to have Christmas, he would not have his court-ordered visitation. He said that he knew the therapist had advised Faulkner that taking away Christmas was not a good punishment. He said that he does not agree that removing everything from JM's room except the bed and dresser for long periods of time is an effective form of discipline, that Faulkner told him that she had taken everything from JM for a week, that this is inappropriate for a five-year-old, and that JM told him Paige had spanked her with a belt. He said that JM does not struggle with transition when she visits him and that he did not know of JM's therapy or that she was to have directed play until he heard about it in court.

Dr. Jason Lagory is JM's therapist and was classified as an expert witness. He testified that JM has diagnoses of ADHD combined type and an adjustment disorder with mixed disturbance of emotions and conduct. He said that the first section of therapy went well, that Faulkner and Paige had participated, and that they saw good progress in JM's behavior and in the adults' ability to use the skills that were taught. He said that therapy recently started again in August, and they were adding an additional component because of a recent

10

event over Labor Day weekend. JM had said that when she got back to her mother's house after visitation, she was going to kill herself. He said that they decided to add more of an individual component for her therapy to work on developing JM's individual coping skills. He said that from JM's description of the event, he thought it was a reaction to her not getting her way.

Dr. Lagory said that the first section of therapy ended on March 25, and it was child directed, and it set the stage for the second section, which is parent directed. The parent-directed portion is on compliance, so it teaches the caregiver how to give effective, concise commands and uses consequences when JM does not comply and rewards behavior when she does. He said that the reason therapy stopped was because "we" did not want to start the second component and stop it because of summer visitation. He said that Paige had been a part of the therapy because it is important for anyone who is a primary caregiver to participate in therapy. He does not think Faulkner prioritizes her relationship with Paige over JM.

When asked what effect it would have on JM if she were removed from Faulkner's home, Dr. Lagory said that any child would be significantly negatively affected if removed from a parent's home. He said that even when a child is experiencing abuse in the home, removing the child can have a negative effect on the child because he or she would have mixed feelings. He said he was not aware of any abuse of JM. He did not recommend to Faulkner that JM's visitation with her dad be reduced, and he said that he did not include McCain when beginning therapy because he is not licensed in Oklahoma but that McCain would always be welcome to attend. He said it would not surprise him to learn that McCain

11

reports that JM behaves well at his home because normally the primary caregiver has the child during times when the child is enrolled in school, and one parent gets identified as the fun parent, and the primary caregiver has all the obligations. He said that he had talked to JM one time alone, but generally, she is accompanied by either Faulkner or Paige for therapy.

When the circuit court questioned him, Dr. Lagory said that JM was diagnosed primarily from Dr. Ekdahl's testing and from Faulkner's reporting. He said that depending on the environment, whether in school or not, JM may not have adverse symptoms from not taking her medication. He said that he could have contacted McCain when taking JM's medical or psychological history and that Faulkner told him that McCain knew JM was beginning therapy. He said that if custody were changed to McCain, it would be important for JM to have therapy, to have McCain's involvement, and to have regular contact with Faulkner. He said if JM remained in Faulkner's custody, he would recommend that therapy be instituted, possibly separately.

The attorney ad litem's report was admitted over Faulkner's objection, and it states,

> As the attorney ad litem for JM, it is my belief and argument that material changes of circumstances have occurred since the agreed order was entered. The material changes are that Mom is unwilling to coparent with Dad; she is unwilling to be flexible and allow Dad and JM to have a healthy relationship; she prioritizes her relationship with her partner over the child's relationship with her father; and she totally blames Dad for the child's behaviors while overlooking her own contributions to the problems and the child's mental health diagnoses.

At the conclusion of the hearing, the circuit court asked each party and the attorney ad litem to provide proposed findings of fact and conclusions of law. A flurry of motions and responses followed involving a dispute among the parties and the ad litem about the

12

timeliness of the other's proposed findings and conclusions and whether additional exhibits, which were not admitted as evidence during trial, should be attached to those pleadings. McCain filed a motion to change custody and for expedited consideration on November 4 alleging that JM's circumstances had deteriorated since the hearing on September 24.

## II. *Order Changing Custody*

On November 25, the circuit court filed its final order, finding that a material change in circumstances had taken place since the agreed order of September 18, 2017, and that it is in JM's best interest for McCain to have full physical and legal custody of JM subject to Faulkner's visitation. The court denied all pending motions to strike filed since the final hearing date and denied as moot McCain's November 4 motion to change custody and for expedited relief. The circuit court gave "weight" to the attorney ad litem's recommendations and found the conclusions included in the report to be "particularly comprehensive." The court also stated that Dr. Lagory's conclusions were not particularly helpful because he did not include McCain in his analysis or evaluation of JM's behavioral issues, and he did not seek to include McCain in his therapy plan. The court found that Dr. Lagory had an insufficient basis to conclude which home would be preferable for JM. The order states:

6.    THAT the Court is particularly troubled by the use of handcuffs to discipline the child regardless of however brief [Faulkner] characterizes that usage.

7.    THAT the parties cannot co-parent in part, because of [Faulkner's] refusal to do so, but also because the parties reside in different states which precludes a joint custody arrangement.

The circuit court ordered McCain to secure a therapist/counselor for JM within thirty days of the custody exchange and that McCain participate in family counseling with the child as

13

directed by the therapist. The court found that Faulkner should be invited to participate in the child's counseling as the therapist sees fit and ordered that only the parties should discipline the child and that corporal punishment is prohibited. The court also prohibited solitary confinement in conjunction with the withdrawal of all toys and personal items for prolonged periods of time for the purpose of punishment and prohibited the parties from canceling holiday celebrations and gifts to punish the child.

III. *Material Change in Circumstances*

Faulkner appeals the court's order, arguing that the circuit court erred when it found a material change in circumstances had occurred in her home. Our well-settled standard of review is as follows:

> This court considers the evidence de novo and does not reverse unless the circuit court's findings of fact are clearly erroneous. *Cordell v. Cordell*, 2018 Ark. App. 521, 565 S.W.3d 500. A finding is clearly erroneous when, although there is evidence to support it, the court is left with a definite and firm conviction that the circuit court made a mistake. *Id*.

> In custody-modification cases, courts impose more stringent standards than they do for initial determinations of custody in order to promote stability and continuity in the life of the child and to discourage the repeated litigation of the same issues. *Geren Williams v. Geren*, 2015 Ark. App. 197, at 10, 458 S.W.3d 759, 766. A judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child or when there is a showing of facts affecting the best interest of the child that were either not presented to the trial court or were not known by the chancellor when the original custody order was entered. *Jones v. Jones*, 326 Ark. 481, 931 S.W.2d 767 (1996). The party seeking to modify the custody order has the burden of showing a material change in circumstances. *Geren Williams*, *supra*. In order to change custody, the circuit court must first determine that a material change in circumstances has occurred since the last custody order; if that threshold requirement is met, it must then determine who should have custody, with the sole consideration being the best interest of the child. *Id*.

*Skinner v. Shaw*, 2020 Ark. App. 407, at 7–8, 609 S.W.3d 454, 458–59.

14

Faulkner contends that the court's order does not state what the change in material circumstances is and that there were no rulings from the bench indicating a basis for so finding. She argues that the circuit court gave the ad litem's recommendations "undue weight" and that the circuit court appears to have based its ruling that a material change in circumstances occurred almost exclusively on the ad litem's recommendations. She admits that the report is admissible as evidence, *Tracy v. Dennie*, 2012 Ark. 281, 411 S.W.3d 702, but argues that the circuit court should not abdicate it decision-making authority to the ad litem. *See Ward v. Williams*, 354 Ark. 168, 118 S.W.3d 513 (2003) (holding that circuit court did not abdicate its duty on remand by impermissibly relying on the obiter dictum of the Arkansas Court of Appeals but independently reviewed the evidence).

Faulkner asserts that there are inherent dangers associated with the admission of an ad litem's report, that ad litem reports are often replete with hearsay and do not afford either party an opportunity to cross-examine or challenge the information, and that the circuit court should afford the information in the ad litem's report limited weight. *See Tracy*, 2012 Ark. 281, at 11–14, 411 S.W.3d at 708–11 (Goodson, J., concurring) (discussing the hearsay rule in relation to attorney ad litem reports).

The remainder of Faulkner's argument is based on her disagreement with the attorney ad litem's conclusions regarding a material change in circumstances. Faulkner points to McCain's testimony that he stopped attempting communication when it became difficult and her own testimony that she stopped attempting communication when McCain failed to provide input into medical and educational decisions for JM. Thus, she complains that any issues with cooperation are issues perpetuated by both parties but that the ad litem

15

report seems to absolve McCain of all responsibility. She notes that the interim order encourages cooperation, but absent agreement, decisions were left to her.

Faulkner argues that the instant case is analogous to *Geren Williams*, *supra*, and that although the communication between her and McCain has not always been optimal, she argues that the behavior does not rise to the level of a material change in circumstances warranting a change in custody. "Petty complaints and parental gamesmanship may not rise to the level of a material change in circumstances, especially if the child is left relatively unscathed." *Geren Williams*, 2015 Ark. App. 197, at 13, 458 S.W.3d at 767–68 (citing *Hart v. Hart*, 2013 Ark. App. 714, at 3). In *Geren Williams*, we reversed the circuit court's change-of-custody order and held that the mother's aggressive behavior and demeanor was not enough to constitute a material change in circumstances. *Id.*

The instant case is distinguishable from *Geren Williams*, wherein the acrimony between the children's mother and the father's new wife left the child unscathed. Here, more than problems with communication between the parties contributed to the material change in circumstances—JM's behavior, JM's mental-health diagnoses, Faulkner's and Paige's discipline of JM, and Faulkner's shift from cooperation with McCain to exclusively blaming him for JM's behavior.

Faulkner's argument is premised on her assertion that the circuit court relied too heavily on the ad litem's recommendations. We hold that the evidence presented is sufficient to support the circuit court's conclusions. The evidence included that Faulkner became unwilling to facilitate visitation with McCain when he returned from his deployment. She filed a motion to shorten McCain's summer visitation even before he had

16

any summer visitation after his return from being deployed. Faulkner further claimed that JM's school suspensions were directly caused by contact with McCain.

In May 2019, Faulkner testified that JM began having violent outbursts at the beginning of the school year. Paige, Faulkner's partner, testified that those behaviors began in June 2018. When JM entered school, she had not had visitation with McCain for nearly a year because he was in Afghanistan, and between his return in September 2018 and December 2018, he did not have extended visitation with JM.

Further, the evidence was that JM's behavior changed from her being a well-adjusted child without behavioral issues in September 2017 to a child who hit and spit on employees and children at daycare in June 2018. She was diagnosed with ADHD and an adjustment disorder in November 2018. Her behavior apparently escalated by December 2018, and JM was suspended from school and eventually was placed in an alternative school in January 2019. Accordingly, sufficient evidence supports the circuit court's finding of a material change in circumstances.

IV. *Best Interest*

Having held that the circuit court properly met the threshold requirement of finding a material change in circumstances, we look to the circuit court's best-interest finding:

> The best interest of the children is the polestar in every child-custody case; all other considerations are secondary. *Cordell* [*v. Cordell*], 2018 Ark. App. 521, at 13, 565 S.W.3d [500, 506]. In deciding whether a modification of custody is in a child's best interest, the circuit court should consider factors such as the psychological relationship between the parents and the child, the need for stability and continuity in the relationship between parents and the child, the past conduct of the parents toward the child, and the reasonable preference of the child. *Dorrell v. Dorrell*, 2014 Ark. App. 496, at 8, 441 S.W.3d 925, 930.

*Skinner*, 2020 Ark. App. 407, at 11–12, 609 S.W.3d at 460–61.

17

Faulkner contends that even if there were a material change in circumstances, the circuit court erred by finding that it was in JM's best interest to change custody to McCain. Faulkner disputes the attorney ad litem's report, which raised concerns regarding Faulkner's placing her relationship with Paige over her relationship with JM; Paige being a stricter disciplinarian; and Paige acting as primary disciplinarian. Faulkner points to both her own testimony and Paige's testimony refuting these concerns, states that JM is the only person that reported this to the ad litem, and argues that it would be in JM's best interest to develop a better relationship with Paige.

She contends that parental differences regarding childrearing techniques for a child with psychological conditions are attributable to environmental factors, and McCain's testimony that the medication made JM lethargic and less playful is "precisely what the medication is intended to do in order to help facilitate the child sitting through a school lesson and focusing her attention on her teacher." Thus, she argues that the difference in parental discipline is not connected to either parent's inability to cooperate but because she was the custodian during the school year and McCain enjoyed summer visitation. She argues that if the circuit court had concerns over Faulkner or Paige using corporal punishment on JM, the court could have placed a provision limiting it. *See Marler v. Binkley*, 29 Ark. App. 73, 776 S.W.2d 839 (1989) (affirming circuit court's denial of a motion to suspend visitation and instead ordering that father should not use corporal punishment).[1]

---

[1]We note that the circuit court prohibited corporal punishment in both the interim order and the final order changing custody.

Faulkner opposes the ad litem's report regarding JM's therapy and complains that the ad litem's failure to understand why the break in therapy occurred is "shocking" because Dr. Lagory explained it numerous times. She disagrees with the ad litem's view of JM's version of events and custody preference and argues that JM's stated preference should not be given considerable weight because of her young age. Ark. Code Ann. § 9-13-101(a)(1)(A)(ii) (Supp. 2019) (a child's preference can be considered if the child is of sufficient age and mental capacity, regardless of chronological age). The child's preference is not binding and is simply a factor to be considered by the circuit court. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999).

Faulkner argues that the circuit court's findings do not reflect the record. She disagrees that the parties are unable to coparent partially because of her and partially because they live in different states. She claims that both parties contributed to these issues, and to state that their inability to coparent is her fault as a reason for a change of custody is inaccurate and reversible error. She contests the court's findings that Dr. Lagory did not include McCain in his analysis and evaluation and did not seek to include him in JM's therapy plan. She contends that Dr. Lagory's testimony "was filled with examples of inclusion of McCain in his analysis and evaluation of JM's behavioral issues." She also argues that multiple attempts were made to include McCain in JM's therapy but that he chose not to participate and that he never requested or obtained records.

Finally, Faulkner seeks to minimize the handcuffing incident, arguing that the handcuffs were on JM's hands for only thirty seconds; they were not tightened around her wrists, and she was able to slip her hands out of the cuffs; and Paige placed JM in the corner

19

with a paper and pen to draw. She argues that it is important to note that Paige was still at work and needed JM to remain relatively well behaved. Also, JM was in Paige's office because she was suspended from school "and it would not be unreasonable for [Paige] to discipline the child in some manner." Faulkner contends that the handcuffing was a one-time incident that happened a year and half before the November 2019 order. She also points to the circuit court's remarks when it referred to the incident by stating, "I don't know that that's as big a deal as it could have been, but I just don't like that."

McCain argues that the circuit court did not err by finding it was in JM's best interest to change custody. He contends that Faulkner's approach to addressing JM's behavior is inadequate and harmful and that Faulkner's version of events is not credible. Because the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Lee v. Childs*, 2020 Ark. App. 156, 597 S.W.3d 124. There are no cases in which the superior position, ability, and opportunity of the circuit court to observe the parties carry as great a weight as those involving minor children. *Id.*

The evidence presented was that JM was tested for ADHD in November 2018, and she began therapy in January 2019, more than six months after she began exhibiting serious behavioral issues. JM began medication for her behavior in March 2019. Faulkner's explanation regarding ending therapy in March was inconsistent—she testified in May that she was looking for a new therapist and that JM needed individual therapy, and she testified in August that the discontinuance of therapy was a planned break recommended by the

20

therapist and that the next phase of therapy would begin after JM returned from summer visitation. Faulkner testified that when she took JM's belongings out of her room for punishment, she took only large, easily accessible things but not all of JM's toys. But Paige emphasized in her testimony that absolutely everything had been taken from JM's room.

When Paige was asked about handcuffing JM, she first responded, "Not me particularly, no . . . ." Then, she later described the incident and stated that she had placed handcuffs on JM. Faulkner acknowledged that this was inappropriate, but she argues in her appellate brief that it was reasonable for Paige to discipline JM, who had just had her fifth birthday, "in some manner" for her "suspension from school."

Faulkner is asking this court to reweigh the evidence in her favor, but credibility determinations are left to the circuit court, and we will not reweigh the evidence. *See Williams v. Williams*, 2019 Ark. App. 186, 575 S.W.3d 156; *Colston v. Williams*, 2018 Ark. App. 455, 556 S.W.3d 548; *Glisson v. Glisson*, 2018 Ark. App. 21, 538 S.W.3d 864. Given our standard of review and the special deference we give circuit courts to evaluate the witnesses, their testimony, and the child's best interest, we cannot say that the circuit court clearly erred.

Affirmed.

GRUBER, C.J., and HARRISON, J., agree.

*The Law Offices of Dustin A. Duke, PLLC*, by: *Dustin A. Duke*, for appellant.

*Mylissia M. Blankenship*, for appellee.