Cite as 2021 Ark. App. 479

# ARKANSAS COURT OF APPEALS
DIVISION II
No. CV-20-710

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered** December 1, 2021 |
| AIMEE WALTON | APPELLANT | APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. 73DR-17-301] |
| V. |  |  |
| RUBEN WALTON | APPELLEE | HONORABLE CRAIG HANNAH, JUDGE |
|  |  | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Aimee Walton appeals the White County Circuit Court's order modifying custody of her two minor children, B.W. and A.W. The circuit court removed the children from appellant's custody and placed them in the custody of their father, appellee Ruben Walton. Appellant argues that the circuit court erred in finding a material change in circumstances and in determining that it was in the children's best interest to transfer custody to appellee. We affirm.

The parties were married on August 15, 2014, and appellant filed for divorce on May 4, 2017, alleging general indignities. Appellee filed an answer and counterclaim for divorce on May 26. Both parties argued that they were the fit and proper parent to have custody of the children. The divorce decree was entered on February 20, 2018, granting appellant an absolute divorce from appellee on the ground pled in her complaint. Appellant was

awarded primary legal and physical custody of the children. Appellee was awarded visitation with the children every other weekend from Thursday evening until Monday morning. On the weeks he did not have the children for the weekend, appellee was granted visitation every Thursday until Friday morning. The decree stated that appellee's visitation would have to be shortened if he had to work the weekend of visitation and did not have a relative who could assist in child care. During the summer, the parties were to alternate physical custody of the children with one week on and one week off. The decree also provided a schedule for the parties to alternate holidays. Appellee was ordered to pay $156 a week in child support as well as $480 a month towards day-care expenses. The decree further provided that neither party was to have an overnight companion with whom the party has a romantic relationship and is not married to while the children are present.

Appellee filed an emergency petition to change custody on July 19, 2019, alleging a material change in circumstances. More specifically, appellee alleged that when he picked the children up for visitation on July 10, he discovered burns on B.W.'s left arm and torso and hand-shaped bruises on B.W.'s buttocks. B.W. indicated that the bruises were caused by appellant's boyfriend after B.W. had wet the bed. B.W. also stated that he had been told not to tell anyone about how the bruises happened. An emergency order of protection was granted in the Lonoke County Circuit Court, and appellant admitted spanking B.W. on his buttocks. Appellee asked the circuit court to grant him temporary custody of the children so that their health, welfare, and safety could be protected. Appellee also sought child support and attorney's fees and costs. Appellant filed a response on July 31, denying the material allegation of appellee's emergency petition. She filed an amended response on

2

August 6, stating that the alleged burns on B.W. were lesions due to impetigo, and the diagnosis had been confirmed by Arkansas Children's Hospital (ACH) on July 11 and Unity Health Center on July 16, well before appellee's emergency petition. Appellant stated that prior to appellee's marriage to Samantha Davis on July 19, appellee had not exercised regular visitation and that the children had never spent a full week at appellee's residence before the ex parte protection order was entered on July 11.[1] Appellant claimed that appellee was not current on his child-support obligation, and she moved to modify child support.

A temporary order was filed on August 20, granting appellee temporary emergency custody of the children pending the resolution of the DHS investigation. The order stated that at the conclusion of the DHS investigation, the children would be returned to appellant with appellee returning to his previously ordered visitation unless there was a true finding of abuse and recommendation of removal of the children from appellant. The order also prohibited the parents or anyone in their households from using corporal punishment on the children. An attorney ad litem was appointed by an order filed on February 19, 2020. On March 3, appellant filed a motion to dismiss appellee's emergency petition to change custody. In the petition, appellant stated that appellee had overreacted to a medical condition and that when the children were picked up for visitation, appellant was in the hospital delivering her baby and was unable to relay the information concerning the children's impetigo to appellee. Appellant contended that DHS had not made a recommendation of removal of the children from her home and that she is the legal

_____

[1]The protection order was extended until August 2, and appellant was allowed only limited visitation with the children.

3

custodian of the children. She asked the circuit court to dismiss appellee's petition because there was no emergency or change in circumstances.

Appellee filed a petition for contempt on May 28, alleging that appellant had willfully denied his visitation with the children, had discussed the court matter with the children, had made disparaging remarks about appellee to the children, and had continuously harassed appellee and members of appellee's household. Appellant filed an answer on June 5, denying the allegations in appellee's petition for contempt.

The circuit court held a custody hearing on June 8. Appellee testified that he initially filed for emergency custody of the children in July 2019 because B.W. had bruises on his bottom and skin lesions that he assumed were burns. He stated that he later found out at ACH that the lesions were impetigo. He denied that appellant had informed him about the impetigo and said that the lesions were on both children and required medication. He testified that there are other children in his home, and that although impetigo is highly contagious, appellant did not notify him of the children's condition prior to him picking them up for visitation. He stated that he subsequently learned that appellant had been treating the children's impetigo with one of their sibling's medications. Appellee said that he was in the living room while Samantha was getting the children ready for a shower when she called him into the bathroom to look at B.W.'s bottom. He said that when he looked, he could see a handprint on B.W.'s bottom that already appeared to be bruising. He stated that he called the Cabot Police Department and put in an affidavit for child abuse. He said that DHS contacted him and sent out an agent, Melissa Davis, to observe B.W. and take pictures. He stated that he subsequently took B.W. to ACH to see about what he believed

4

to be burns. He said that B.W. told him that Jack had spanked him for wetting his bed. He stated that, according to B.W., Jack was appellant's live-in boyfriend. He said that B.W.'s story about how he got the bruises has never changed. Appellee testified that B.W. was taken to the police station for an interview. He stated that during a previous emergency hearing, appellant testified that she was the source of B.W.'s bruise. He said that he had temporary custody of the children for about a month and a half until DHS concluded its investigation with a finding that the claim for abuse by Jack was unsubstantiated.

Appellee stated that he is currently a truck driver and is usually home each weekend from Friday until Sunday evening or Monday morning. He said while at home, he spends time playing with the children or watching television with them. He testified that prior to the emergency petition, he had to "fight tooth and nail to get any time" he could get with the children. He said that appellant denied him the week-to-week visitation he was supposed to receive in the summer of 2019 because he did not utilize it the prior year. He stated that she also refused his Thursday-night visitation because B.W. was in school in Jacksonville and could not miss any days. However, he testified that he was able to keep his Thursday to Monday visitation schedule, but the visits were usually shortened because he was the only one allowed to pick up and drop off the children. He said that appellant allowed the children's grandparents to pick them up only once—Thanksgiving. Appellee stated that appellant has constantly told him that B.W. said he does not want to come to appellee's house and did not want to be with Samantha when appellee is not home; however, he stated that he has never seen any indication that B.W. did not want to come with him. Appellee stated that, following the hearing in January, appellant had begun letting

5

him utilize his Thursday visits, but that quickly reverted to no Thursday visits. He said that appellant told him that if Samantha could not meet her with the children at 6:00 a.m. on Friday mornings at the Cabot Post Office, there could be no Thursday visits. He stated that they had started the summer-visitation schedule early based on the ad litem's recommendation. He testified that he lost a day with the children on both Mother's Day and Memorial Day, and appellant would not allow him to keep the children an extra day to make up for the lost days.

Appellee stated that he did not meet Jack until they were in court at the custody hearing. He confirmed that there are photos of Jack with appellant and all her children as late as October 2019. There was also a photo of Jack, B.W., and another child on a four-wheeler without any protective gear. Appellee stated that he had recently applied to be a fleet manager at Maverick so that he can work Monday through Friday, 9:00 a.m. to 5:00 p.m., but COVID-19 has led to a hiring freeze at the company. Appellee admitted that he would suffer a nearly $30,000 pay cut if he was hired for the position but that he is willing to take the pay cut to be at home with his children. He said that if he receives custody of the children, he wants appellant to initially have a probationary period where she receives supervised visitation until he feels comfortable that Jack is not around the children. Appellee agreed that he had been behind on his child-support payments but stated that as of April, he was current. He said that he is concerned about the children's safety while in the home with appellant and Jack because it is his belief that Jack caused the bruises on B.W.'s bottom, although appellant claims to have been the culprit. He stated that in his opinion, appellant came to court and lied to protect her relationship with Jack. Appellee stated that appellant

has moved three to five times in the past eighteen months, and he has concerns about the children's stability. He said that Jack has been present a couple of times when appellant dropped the children off and that Jack's parents have also picked up the children from school and dropped them off at school. Appellee testified that he lives in a three-bedroom home and that when the children visit, B.W. has his own room and A.W. has her own bed but shares a room with Samantha's two daughters. He stated that he has been informed of a similar living situation at appellant's home, the only exception is that B.W. shares a room with Jack's son.

On cross-examination by appellant, appellee stated that he and Samantha lived together prior to getting married. He said that he is the primary financial provider for the children when he has them. He also stated that he puts the children to bed when he is home, Samantha does it when he is not home. He testified that his work schedule is usually Monday through Friday but that he sometimes does not get home until Saturday, and there are times he must leave on Sunday. He stated that both he and Samantha have used their hand to spank the children on the rare occasions a spanking is necessary. He admitted that his parents had picked the children up for his visitation when he worked a different job. He also said that Samantha has been the one picking up and dropping off the children recently. He stated that they had agreed not to use the week-to-week visitation during the summer of 2018 because he was on call and never knew whether he would be called out to a job. He testified that he rarely missed his regularly scheduled visitation with the children. Appellee stated that Samantha takes care of the children when he is not home. He stated that Samantha usually spends more time with the children during the week-to-week visits

because he works. He also said that Samantha enjoys the Thursday visits alone with the children unless, for some reason, he gets home. Appellee stated that he told appellant he did not care about B.W.'s not wanting to be picked up and kept by Samantha when appellee is not home because he still wanted B.W. at his home for visitation. He said that he has had to learn about appellant's relocations through third parties. Appellee stated that the children had been disciplined by him about two to three weeks before the hearing and that B.W. had received a "swat" and both children had received a stern talk. Appellee admitted that he picked the children up from the hospital when appellant was in labor on July 10 and that appellant's sister brought the children down to him. He stated that DHS was notified about the bruises on B.W.'s bottom because, to him, it indicated that B.W. had been spanked "with excessive force." He said that he does not feel a need to spank the children, but their behavior sometimes leads to that result. He denied ever leaving a bruise on either of the children. He stated that he has kept B.W. out of school twice to spend more time with him but that he has not done it since learning that B.W. can be removed from the pre–K program if he misses ten days. He said that he has not spoken with the children about the court case but that he has inquired about Jack. Appellee stated that he is looking to provide the children with a safe and stable environment. He opined that moving the children "five or six times, having to switch schools, things of that nature" were signs of instability. He stated that he can provide for the children if given primary custody. He agreed that with his current work situation, Samantha will be the children's primary caregiver. He testified that his coparenting relationship with appellant is "awful" because

they cannot discuss anything or compromise about anything, and it is "usually [appellant's] way or no way."

On cross-examination by the ad litem, appellee stated that he has worked for Maverick for about eighteen months. He stated that it was never his intention to remain an over-the-road truck driver, but he took the job for financial reasons. He said if he was granted custody of the children, he would place them in the Beebe School system until they graduated high school. He stated that he and Samantha were together about a year before they were married.

On redirect, appellee stated that he did not provide appellant with a work schedule when she requested it because he does not have a physical work schedule. He denied ever leaving bruises on the children when he spanks them. He stated that during the summer of 2018, he could not utilize the week-to-week visitation because his work schedule would not allow time for it. He said that when he tried to utilize the summer schedule in 2019, appellant would not allow him to because he did not use it in 2018. Upon questioning by the court, appellee stated that he was able to have visitation with the children from Thursday to Monday in 2019.

Chad Fowler, a detective with the Cabot Police Department, testified that he oversaw an interview with B.W. at the Wade Knox Child Advocacy Center in Lonoke. He stated that although there were a few things that were exaggerated, B.W. remained consistent about Jack being the person who spanked him and left the bruises on his bottom. He also stated that B.W. indicated Jack had spanked him several times and that the spanking in question was a "good one." He testified that he did not have any concerns about the

veracity of B.W.'s statements concerning how he received the bruises. He stated that his investigation centered mostly on the open wounds on B.W. and A.W., which were found to be impetigo. He said that he learned from appellant that she was treating the children with another child's medication. He recalled that appellant had said in their first conversation that she was the one who spanked B.W. He testified that he recommended that criminal charges be filed against Thurman Easton Daniel (Jack), and that there is an active warrant for Jack.

On cross-examination by appellant, Detective Fowler testified that it was not possible in this situation that appellant spanked B.W., but because B.W. turned around after the spanking and saw Jack walking into the room, B.W. assumed it was Jack who had spanked him. Detective Fowler stated that B.W. was very specific that after he wet the bed, Jack came into the room and spanked him. He said that after the spanking, B.W. stated that he went to appellant, and she kissed him. He stated that he was unaware of Jack being cleared of any wrongdoing by DHS and that he is only concerned with the criminal side of it. He testified that the warrant for Jack is for second-degree domestic battery.

On cross-examination by the ad litem, Detective Fowler stated that the bruises on B.W. were consistent with a "very rough spanking." He said that you could see that the bruises were made by "a hand or a hand-like object."

Samantha testified that she is currently married to appellee and that she has two children who also live in the home. She said that B.W. has his own room, which doubles as the playroom, and that A.W. shares a room with her two daughters. She stated that she dated appellee for almost a year before they got married on July 19, 2019. She said that she

first met appellant when appellant came to their house to see if she was comfortable allowing Samantha around the children. She testified that there were times during the summer of 2019 when appellant did not allow appellee to have his every-other-week visitation. She stated that after the children had been returned to appellant's custody following the conclusion of DHS's investigation, appellant would only allow appellee to pick up and drop off the children. She said that prior to the emergency hearing, there was never an issue about her being alone with the children. She stated that the situation changed slightly in January following a court hearing but that appellant then started saying that B.W. did not want to come for the visits. She said that the children had started calling her "mom," but she told them they could call her what they want to call her. She admitted that due to appellee's work schedule, she is currently the children's primary caregiver when they are at her house. Samantha testified that if appellee is granted custody of the children, she would work while they are in school and pick them up after school. She stated that most of the time, co-parenting between her and appellant is a fight. She said that she is the one who initially saw the bruises on B.W. when she was preparing the shower for him. She testified that the bruise was a hand mark that covered B.W.'s entire bottom. She stated that B.W. told her Jack spanked him real hard for wetting the bed. She said that she saw Jack in court and at A.W.'s birthday party when they picked her up. She stated that an anonymous complaint was filed against her with the cosmetology board stating that she was doing hair at her home or salon during the quarantine. When she asked for a copy of the complaint, she was able to see that it originated from aimeewalton@hotmail.com with a date of occurrence of May 3, 2020. She stated that she did cut B.W.'s hair once at her home during

the May visitation. She testified that she plans to go back to work when the children go back to school and that appellee has applied for a local job with his company.

On cross-examination by appellant, Samantha stated that her marriage to appellee was not rushed and denied that it had anything to do with this case. She stated that she has been the one picking up and dropping off the children lately, when she is "not denied," which has happened eleven times because she does not want to wake her children that early to meet appellant at 6:00 a.m. at the Cabot Post Office with B.W. and A.W. She testified that she once was late getting B.W. to school and had been continuously denied Thursday visitation since then. She admitted that B.W. threw a fit once when it was time to go with her; however, she stated that B.W. has expressed how much he loves being at their house and wishes he lived with them. She stated that she has cut B.W.'s hair at appellee's request despite appellant not wanting her to. Samantha denied driving by appellant's home multiple times when appellant lived in Cabot or having any knowledge of a police report filed by appellant against Samantha and appellee for allegedly driving by appellant's home. She stated that she rarely disciplines B.W. and A.W. and that she spanked them with her hand about a month ago.

Melissa Davis, an investigator with Lonoke County DHS, testified that she was the primary investigator in the case concerning B.W. after receiving a hotline report on July 10. She stated that she went to appellee's home and made contact with appellee and B.W. She testified that B.W. told her he had gotten in trouble and was spanked and had marks on him. She said that B.W. had several marks on his body that turned out to be impetigo. As for the bruises, she stated that it was "across both butt cheeks of [B.W.] that had the lines

12

that are very consistent with a hand -- like a spanking hand print, multiple marks." She said that B.W. was very consistent that Jack had caused the bruises. She stated that when she asked appellant about the bruises, appellant said that she "assumed" that she spanked B.W. and caused the bruises. She testified that at the DHS hearing, appellant was adamant that she had spanked B.W. for "backing-talking her" and caused the bruises. Davis said that she did not have any doubts about the veracity of B.W.'s explanation about the bruises; however, she stated that she did have concerns about the veracity of appellant's explanation about the bruises on B.W. She said that as a result of her investigation, she recommended that there be a true finding of abuse by Jack. She opined that Jack caused the bruises on B.W. and that appellant is covering for Jack. She stated that it is not appropriate for a parent to leave bruises on a child as a form of discipline. She said that B.W. told the interviewer that Jack had left marks on him before. She testified that she recommended to appellant that Jack should not be allowed to be around the children but that to her knowledge, Jack never moved out of the home. She stated that DHS had initially made a true finding of abuse against Jack, but the finding was changed on appeal because appellant testified that she was the one who had spanked B.W. and left the marks on him.

On cross-examination by appellant, Davis testified that she is aware that the case against Jack is closed and unsubstantiated. She stated that it is possible that appellant could have been under the influence of pain medication at the time of her interview with appellant since appellant had just given birth a couple of days prior. However, Davis said that she did not feel like appellant was under the influence of anything. She testified that based on

13

B.W.'s disclosure, it is not possible to assume that appellant spanked B.W. and B.W. thought it was Jack because Jack walked into the room afterwards.

During her testimony, appellant admitted that there were hand-shaped bruises on B.W.'s buttocks in July 2019. She said that she was the one who put the bruises there. She stated that she did not believe a spanking should leave bruises and said that it was the only time it had. She denied that there were multiple hand marks on B.W. She said that she and appellee agreed in the summer of 2018 that they would not do the week on and week off arrangement as contemplated by the divorce decree because of appellee's work schedule. She conceded that she told appellee no the summer of 2019 when he wished to utilize his extended visitation because he had not done so the previous year. She stated that she allowed appellee to have his court-ordered visitation the fall of 2019 and January 2020. She denied requiring appellee or Samantha to pick the children up at a certain time and bring them back at a certain time to have Thursday visitation every other week. Appellant testified that she lived at 27 Wolverine Drive in Cabot in January 2019 and that she did not move from that residence until November or December that year. She stated that she moved from Cabot to 126 Robin Road in Jacksonville. She said that she and her five children lived in the house on Wolverine Drive and that Jack would occasionally stay with her, but he did not live there. She explained that occasionally was about once a month. She said that Jack did not physically discipline B.W. during that time. She testified that they all live in the house in Jacksonville but stated that Jack is not there when B.W. and A.W. are home. She testified that Jack lives with him mom in Bryant when B.W. and A.W. are at her house;

14

however, she said that he is there each day, he just does not stay over those nights. She admitted that she considers Jack's children to be her children.

Appellant testified that she and Jack are discussing marriage. She stated that she is currently unemployed and that Jack provides for her and her children. She said that she and Jack signed a lease together in November 2019. She stated that she had allowed Jack's parents to pick up her children. She denied having an issue with appellee's parents picking the children up. She said that she could not remember telling appellee on Thanksgiving if he could not pick the children up, nobody could. She agreed that appellee is capable of providing for the children. She admitted that she submitted the complaint against Samantha to the cosmetology board. She testified that she has denied appellee visitation when he does not get the children to school on time or keeps them out of school. She stated that appellee was late bringing B.W. to school at least once. She said that B.W. was originally in pre-K in Beebe and was subsequently switched to Jacksonville when they moved. She stated that she remembers the incident where she spanked B.W. and left the bruises on his bottom. She said that she does not recall appellee ever leaving bruises on B.W., but appellee has left red marks on B.W. when they were married. Appellant testified that her main concern with appellee having custody of the children is his not being home and having Samantha take care of the children. She stated that the parties "cannot communicate well at all." She indicated that she does not mind Samantha keeping the children, but it takes away time that she could be spending with them. She stated that she would not mind the children being at appellee's home if his work schedule changed and he was home more. She said that it is in the children's best interest that they spend more time with appellee.

15

On cross-examination by the ad litem, appellant stated that the incident in which B.W. was spanked and bruises were left on his bottom happened one day before she went into the hospital to have a C-section. She said that she did not recall Davis advising her not to have Jack around. She admitted that the ad litem suggested that Jack not be around the children while everything was still pending; however, she stated that Jack continued to be around the children after that conversation. Appellant agreed that she and the ad litem had not communicated much during this case, and as a result, the ad litem was never able to conduct a home visit. She stated that she relocated to Jacksonville because it was a bigger home in a better area, and due to the quality of education the children could receive. She denied knowing that the move would cause issues with appellee's visitation.

When allowed to make statements on her own behalf, appellant stated that she believed it would be fair for Samantha to get visitation once a month with the children if appellee is not at home. She also suggested that every other weekend visits be from Friday evening to Sunday evening and that the children be picked up and dropped off at a halfway point. She said that if appellee is able to do the one week on, one week off visitation during the summer, she would be fine with it.

At the conclusion of the evidence, the ad litem stated that the children voiced to her that they do not like Jack and do not like being around him. A.W. also suggested that Jack may be abusing appellant. She told the circuit court the following:

> I think there is a lot of animosity between Aimee Walton and Samantha Walton, and I think we saw a little bit of that in our hearing today. I think we've got some games being played with visitation. The biggest concern I have, as far as Ruben Walton, is his work schedule. It is unfortunate that we are in the middle of this pandemic. He did apply to get his work schedule changed. I know that he has interviewed for this position where he can be home more often. I don't like the

16

idea of a step-parent being the one that's kind of in charge, but, under these circumstances, I just don't believe that Ms. Aimee Walton has either done anything to protect her children from Jack, or she, herself, has abused these children while they're in her care. And I get her plight, and I believe her tears are real. I believe she loves her children. I believe they love her as well. But I just think that she has failed them when it comes to Jack. I believe that she has picked Jack over her children and over their safety. And I believe that custody should be changed to Mr. Ruben Walton.

The circuit court made the following oral ruling:

> There was a petition filed for motion to change of custody. In order for that to happen, there has to be a finding of significant change in circumstance, and what has been pointed to is the DHS investigation. We heard from the police officer and from the investigator, and they were both pretty adamant about the fact that the boyfriend did it. At the appeal hearing, the mother admits -- or claims that she did it, so there's no question there was some abuse going on. The question was actually who did it. After being instructed by the ad litem to keep the boyfriend away, that didn't happen, so Ms. Walton has failed to protect her kids. Also, she has violated the visitation orders of the Court and unreasonably prohibited visitation. And based upon those, I find there has been a significant change in circumstance. I'm going to award custody to Mr. Walton.

An order modifying custody was entered on July 20.[2] It stated in pertinent part:

5. There has been a material change in circumstances regarding the custody of the children, such that it would be in the best interest of the children for the Defendant, Ruben Walton, to have primary custody of the minor children. This is based upon the abuse of the minor children that occurred in the Plaintiff's home, her failure to protect the minor children, and her denial of the Defendant's visitation.

. . . .

7. Neither party shall discuss this litigation with the minor children. The parties are specifically restrained and enjoined form making any demeaning or derogatory comments about the other party or the family members of the other party in the presence of the minor children and from allowing any other person to do so in the presence of the children.

---

[2]An identical order was entered on July 28.

8. Neither party shall expose the minor children to criminal activity or any nature, drug paraphernalia, illicit drugs, use of alcohol, misuse of prescription drug or the presence of any individual under the influence of drugs or alcohol.

9. Thurmon Eason Daniel, III, (commonly known to the minor children as "Jack") shall have no contact with the minor children

10. There shall be no corporal punishment of the minor children while they are in the custody and care of the Plaintiff.

The order granted appellant almost the same visitation schedule as appellee had been granted when the children were in appellant's custody. Appellant was ordered to pay child support in the amount of $125 a month. Appellant filed a timely notice of appeal on August 11.

In reviewing child-custody cases, we consider the evidence de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence.[3] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made.[4] We give special deference to the superior position of the circuit court to evaluate and judge the credibility of the witnesses, and this deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children.[5]

---

[3]*McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91.

[4]*Boudreau v. Pierce*, 2011 Ark. App. 457, 384 S.W.3d 664.

[5]*McNutt, supra.*

The primary consideration in child-custody cases is the welfare and best interest of the children, and all other considerations are secondary.[6] A judicial award of custody should not be modified unless it is shown that (1) there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child or (2) there is a showing of facts affecting the best interest of the child that were either not presented to the circuit court or were not known by the circuit court when the original custody order was entered.[7] Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody.[8] The reasons for requiring these more stringent standards for modifications than for initial custody determinations are to promote stability and continuity in the life of the child, and to discourage the repeated litigation of the same issues.[9] The party seeking modification has the burden of showing a material change in circumstances.[10] If that threshold is met, the circuit court must then determine who should have custody, with the sole consideration being the best interest of the child.[11]

As her first point on appeal, appellant argues that the circuit court erred in finding that there was a material change in circumstances warranting a change of custody of the children from her custody to appellee's custody. In finding that custody should be changed

---

[6]*Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005).

[7]*Id.*

[8]*Id.*

[9]*Id.*

[10]*Id.*

[11]*Faulkner v. McCain*, 2020 Ark. App. 541, 613 S.W.3d 746.

to appellee, the circuit court focused on the testimony that B.W.'s account of how he received the bruises on his bottom never changed despite the passage of time. B.W. consistently said that Jack was the person who had spanked him hard and caused the bruises. Based on this evidence, a DHS investigation was started, and there was initially a true finding of abuse against Jack. On appeal of the finding, appellant testified that she was the person responsible for the bruises on B.W., not Jack. As a result, the finding was overturned, and a new finding of unsubstantiated was made. However, Detective Fowler and caseworker Davis both testified that they believed B.W.'s account of what happened because he was consistent when recounting that Jack spanked him. Appellee and Samantha also testified that B.W.'s account of who spanked him on the date in question never changed. Appellant testified that she spanked B.W. and caused the bruises; however, the court can choose what testimony to believe. Here, it seems that the circuit court believed that B.W. suffered abuse at Jack's hands. In any event, B.W. suffered bruises on his bottom because of being spanked while in appellant's custody. Therefore, the court did not err by finding that B.W. suffered abuse at appellant's home.

The ad litem questioned appellant about her recommendation that Jack be kept away from B.W. and A.W. while everything was pending, and appellant stated that she did not keep Jack away from them. She stated that although Jack did not stay the night with her when B.W. and A.W. were present, he would be there all day and go to his mother's house in Bryant overnight. Appellant contends that there was never an order requiring her to keep Jack and the children away from each other, but she has failed to cite any authority that holds that before a failure-to-protect finding can be made against a parent, an order

must be entered advising the parent who or what the parent is supposed to protect the children from. Based on this evidence, we cannot say that the circuit court erred in finding that appellant failed to protect her children.

Additionally, appellant argues that both households practiced corporal punishment and that instead of modifying custody, the circuit court could have made a provision limiting it. She claims that this was the proper route to go for a "single hand spanking." However, testimony revealed that Jack had spanked B.W. more than just once. B.W. was not there to testify, but Davis stated that B.W. told the interviewer that Jack had left marks on him before. Thus, despite appellant's single-spanking argument, the circuit court could conclude that this was not an isolated incident.

The circuit court also found that custody should be modified based on appellant's denial of appellee's visitations. Appellant admitted that she denied appellee's request for summer visitation in 2019 because he did not utilize it during the summer of 2018. Both appellee and Samantha testified that appellant would not allow appellee to have his Thursday visits every other week. Appellant denied this claim, but the circuit court could decide which testimony it wanted to believe. Therefore, we cannot say that the circuit court erred in finding that appellant denied appellee's visitation with his children.

Accordingly, we hold that the circuit court did not err by finding that there had been a material change in circumstances warranting a change in custody of the children from appellant to appellee.

For her second point on appeal, appellant argues that the change in custody was not in the children's best interest because appellee was rarely home to enjoy the full visitations

21

with the children. However, the circuit court heard evidence that appellee's job as an over-the-road truck driver kept him away from the home most weeks from Monday to Friday. During the time he is not home, Samantha has the children and takes care of them. The ad litem stated that she usually did not like having a stepparent in charge, but given the circumstances of this case, it was still best for custody to be changed to appellee. The trial court seemed to agree, but it found that changing custody to appellee was in the children's best interest. Appellant seems to be asking this court to reweigh the evidence in her favor, but credibility determinations are left to the circuit court, and we will not reweigh the evidence.[12] Given our standard of review and the special deference we give circuit courts to evaluate the witnesses, their testimony, and the children's best interest, we cannot say that the circuit court clearly erred.

Affirmed.

KLAPPENBACH and GRUBER, JJ., agree.

*The Ballard Firm, P.A.*, by: *Andrew D. Ballard*, for appellant.

One brief only.

---

[12]*See Williams v. Williams*, 2019 Ark. App. 186, 575 S.W.3d 156.